(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KALEY ET VIR *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 12–464.   Argued October 16, 2013—Decided February 25, 2014

Title 21 U. S. C. §853(e)(1) empowers courts to enter pre-trial restraining orders to "preserve the availability of [forfeitable] property" while criminal proceedings are pending.   Such pre-trial asset restraints are constitutionally permissible whenever probable cause exists to think that a defendant has committed an offense permitting forfeiture and that the assets in dispute are traceable or otherwise sufficiently related to the crime charged.   *United States* v. *Monsanto*, 491 U. S. 600.

   After a grand jury indicted petitioners, Kerri and Brian Kaley, for reselling stolen medical devices and laundering the proceeds, the Government obtained a §853(e)(1) restraining order against their assets.   The Kaleys moved to vacate the order, intending to use a portion of the disputed assets for their legal fees.   The District Court allowed them to challenge the assets' traceability to the offenses in question but not the facts supporting the underlying indictment.   The Eleventh Circuit affirmed.

*Held*: When challenging the legality of a §853(e)(1) pre-trial asset seizure, a criminal defendant who has been indicted is not constitutionally entitled to contest a grand jury's determination of probable cause to believe the defendant committed the crimes charged. Pp. 5–21.

   (a) In *Monsanto*, this Court held that the Government may seize assets before trial that a defendant intends to use to pay an attorney, so long as probable cause exists "to believe that the property will ultimately be proved forfeitable."   491 U. S., at 615.   The question whether indicted defendants like the Kaleys are constitutionally entitled to a judicial re-determination of the grand jury's probable cause conclusion in a hearing to lift an asset restraint has a ready answer in the fundamental and historic commitment of the criminal justice system to entrust probable cause findings to a grand jury.   A probable

cause finding sufficient to initiate a prosecution for a serious crime is "conclusive[e]," *Gerstein* v. *Pugh*, 420 U. S. 103, 117, n. 19, and, as a general matter, "a challenge to the reliability or competence of the evidence" supporting that finding "will not be heard," *United States* v. *Williams*, 504 U. S. 36, 54. A grand jury's probable cause finding may, on its own, effect a pre-trial restraint on a person's liberty. *Gerstein*, 420 U. S., at 117, n. 19. The same result follows when it works to restrain a defendant's property.

The Kaleys' alternative rule would have strange and destructive consequences. Allowing a judge to decide anew what the grand jury has already determined could result in two inconsistent findings governing different aspects of one criminal proceeding, with the same judge who found probable cause lacking presiding over a trial premised on its existence. That legal dissonance could not but undermine the criminal justice system's integrity, especially the grand jury's constitutional role. Pp. 5–12.

(b) The balancing test of *Mathews* v. *Eldridge*, 424 U. S. 319— which requires a court to weigh (1) the burdens that a requested procedure would impose on the government against (2) the private interest at stake, as viewed alongside (3) "the risk of an erroneous deprivation" of that interest without the procedure and "the probable value, if any, of [the] additional . . . procedural safeguar[d]," *id.*, at 335—if applicable here, tips against the Kaleys. Because the Government's interest in freezing potentially forfeitable assets without an adversarial hearing about the probable cause underlying criminal charges and the Kaleys' interest in retaining counsel of their own choosing are both substantial, the test's third prong is critical. It boils down to the "probable value, if any," of a judicial hearing in uncovering mistaken grand jury probable cause findings. But when the legal standard is merely probable cause and the grand jury has already made that finding, a full-dress hearing will provide little benefit. See *Florida* v. *Harris*, 568 U. S. ___, ___. A finding of probable cause to think that a person committed a crime "can be [made] reliably without an adversary hearing," *Gerstein*, 420 U. S., at 120, and the value of requiring additional "formalities and safeguards" would "[i]n most cases . . . be too slight," *id.*, at 121–122. The experience of several Circuits corroborates this view. Neither the Kaleys nor their *amici* point to a single case in two decades where courts, holding hearings of the kind they seek, have found the absence of probable cause to believe that an indicted defendant committed the crime charged. Pp. 12–20.

677 F. 3d 1316, affirmed and remanded.

KAGAN, J., delivered the opinion of the Court, in which SCALIA, KEN-

Syllabus

NEDY, THOMAS, GINSBURG, and ALITO, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–464

_____

## KERRI L. KALEY, ET VIR, PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[February 25, 2014]

JUSTICE KAGAN delivered the opinion of the Court.

A federal statute, 21 U. S. C. §853(e), authorizes a court to freeze an indicted defendant's assets prior to trial if they would be subject to forfeiture upon conviction. In *United States* v. *Monsanto*, 491 U. S. 600, 615 (1989), we approved the constitutionality of such an order so long as it is "based on a finding of probable cause to believe that the property will ultimately be proved forfeitable." And we held that standard to apply even when a defendant seeks to use the disputed property to pay for a lawyer.

In this case, two indicted defendants wishing to hire an attorney challenged a pre-trial restraint on their property. The trial court convened a hearing to consider the seizure's legality under *Monsanto*. The question presented is whether criminal defendants are constitutionally entitled at such a hearing to contest a grand jury's prior determination of probable cause to believe they committed the crimes charged. We hold that they have no right to relitigate that finding.

## I

## A

Criminal forfeitures are imposed upon conviction to confiscate assets used in or gained from certain serious crimes. See 21 U. S. C. §853(a). Forfeitures help to ensure that crime does not pay: They at once punish wrongdoing, deter future illegality, and "lessen the economic power" of criminal enterprises. *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 630 (1989); see *id.*, at 634 ("Forfeiture provisions are powerful weapons in the war on crime"). The Government also uses forfeited property to recompense victims of crime, improve conditions in crime-damaged communities, and support law enforcement activities like police training. See *id.*, at 629–630.[1] Accordingly, "there is a strong governmental interest in obtaining full recovery of all forfeitable assets." *Id.*, at 631.

In line with that interest, §853(e)(1) empowers courts to enter pre-trial restraining orders or injunctions to "preserve the availability of [forfeitable] property" while criminal proceedings are pending. Such an order, issued "[u]pon application of the United States," prevents a defendant from spending or transferring specified property, including to pay an attorney for legal services. *Ibid.* In *Monsanto*, our principal case involving this procedure, we held a pre-trial asset restraint constitutionally permissible whenever there is probable cause to believe that the property is forfeitable. See 491 U. S., at 615. That determination has two parts, reflecting the requirements for forfeit-

_____

[1] Between January 2012 and April 2013, for example, the Department of Justice returned over $1.5 billion in forfeited assets to more than 400,000 crime victims. See Dept. of Justice, Justice Department Returned $1.5 Billion to Victims of Crime Since January 2012 (Apr. 26, 2013), online at http://www.justice.gov/opa/pr/2013/April/13-crm-480.html (as visited Feb. 21, 2014 and available in the Clerk of the Court's case file).

ure under federal law: There must be probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime. See §853(a). The *Monsanto* Court, however, declined to consider "whether the Due Process Clause requires a hearing" to establish either or both of those aspects of forfeitability. *Id.*, at 615, n. 10.[2]

Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate the second issue stated above: whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment.[3] But the courts have divided over extending the hearing to the first issue. Some have considered, while others have barred, a defendant's attempt to challenge the probable cause underlying a criminal charge.[4] This case raises the question whether an indicted defendant has a constitutional right to contest the grand jury's prior determination of that matter.

───────────

[2] The forfeiture statute itself requires a hearing when the Government seeks to restrain the assets of someone who has not yet been indicted. See 21 U. S. C. §853(e)(1)(B). That statutory provision is not at issue in this case, which involves a pair of indicted defendants.

[3] At oral argument, the Government agreed that a defendant has a constitutional right to a hearing on that question. See Tr. of Oral Arg. 45. We do not opine on the matter here.

[4] Compare *United States* v. *E-Gold, Ltd.*, 521 F. 3d 411 (CADC 2008) (holding that a defendant is entitled to raise such a challenge); *United States* v. *Dejanu*, 37 Fed. Appx. 870, 873 (CA9 2002) (same); *United States* v. *Michelle's Lounge*, 39 F. 3d 684, 700 (CA7 1994) (same); *United States* v. *Monsanto*, 924 F. 2d 1186 (CA2 1991) (en banc) (same), with *United States* v. *Jamieson*, 427 F. 3d 394, 406–407 (CA6 2005) (prohibiting a defendant from raising such a challenge); *United States* v. *Farmer*, 274 F. 3d 800, 803–806 (CA4 2001) (same); *United States* v. *Jones*, 160 F. 3d 641, 648–649 (CA10 1998) (same).

B

The grand jury's indictment in this case charges a scheme to steal prescription medical devices and resell them for profit. The indictment accused petitioner Kerri Kaley, a sales representative for a subsidiary of Johnson & Johnson, and petitioner Brian Kaley, her husband, with transporting stolen medical devices across state lines and laundering the proceeds of that activity.[5] The Kaleys have contested those allegations throughout this litigation, arguing that the medical devices at issue were unwanted, excess hospital inventory, which they could lawfully take and market to others.

Immediately after obtaining the indictment, the Government sought a restraining order under §853(e)(1) to prevent the Kaleys from transferring any assets traceable to or involved in the alleged offenses. Included among those assets is a $500,000 certificate of deposit that the Kaleys intended to use for legal fees. The District Court entered the requested order. Later, in response to the Kaleys' motion to vacate the asset restraint, the court denied a request for an evidentiary hearing and confirmed the order, except as to $63,000 that it found (based on the parties' written submissions) was not connected to the alleged offenses.

On interlocutory appeal, the Eleventh Circuit reversed and remanded for further consideration of whether some kind of evidentiary hearing was warranted. See 579 F. 3d 1246 (2009). The District Court then concluded that it should hold a hearing, but only as to "whether the re-

---

[5]An earlier version of the indictment did not include the money laundering charge. In its superseding indictment, the Government also accused Jennifer Gruenstrass, another sales representative, of transporting stolen property and money laundering. Her case went to trial, and she was acquitted. Several other sales representatives participating in the Kaleys' activity entered guilty pleas (each to a charge of shipping stolen goods) during the Government's investigation.

strained assets are traceable to or involved in the alleged criminal conduct." App. to Pet. for Cert. 43, n. 5. The Kaleys informed the court that they no longer disputed that issue; they wished to show only that the "case against them is 'baseless.'" *Id.*, at 39; see App. 107 ("We are not contesting that the assets restrained were . . . traceable to the conduct. Our quarrel is whether that conduct constitutes a crime"). Accordingly, the District Court affirmed the restraining order, and the Kaleys took another appeal. The Eleventh Circuit this time affirmed, holding that the Kaleys were not entitled at a hearing on the asset freeze "to challenge the factual foundation supporting the grand jury's probable cause determination[ ]"—that is, "the very validity of the underlying indictment." 677 F. 3d 1316, 1317 (2012).

We granted certiorari in light of the Circuit split on the question presented, 568 U. S. \_\_\_ (2013), and we now affirm the Eleventh Circuit.

## II

This Court has twice considered claims, similar to the Kaleys', that the Fifth Amendment's right to due process and the Sixth Amendment's right to counsel constrain the way the federal forfeiture statute applies to assets needed to retain an attorney. See *Caplin & Drysdale*, 491 U. S. 617; *Monsanto*, 491 U. S. 600. We begin with those rulings not as mere background, but as something much more. On the single day the Court decided both those cases, it cast the die on this one too.

In *Caplin & Drysdale,* we considered whether the Fifth and Sixth Amendments exempt from forfeiture money that a convicted defendant has agreed to pay his attorney. See 491 U. S., at 623–635. We conceded a factual premise of the constitutional claim made in the case: Sometimes "a defendant will be unable to retain the attorney of his choice," if he cannot use forfeitable assets. *Id.*, at 625.

Still, we held, the defendant's claim was "untenable." *Id.*, at 626. "A defendant has no Sixth Amendment right to spend another person's money" for legal fees—even if that is the only way to hire a preferred lawyer. *Ibid.* Consider, we submitted, the example of a "robbery suspect" who wishes to "use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended." *Ibid.* That money is "not rightfully his." *Ibid.* Accordingly, we concluded, the Government does not violate the Constitution if, pursuant to the forfeiture statute, "it seizes the robbery proceeds and refuses to permit the defendant to use them" to pay for his lawyer. *Ibid.*

And then, we confirmed in *Monsanto* what our "robbery suspect" hypothetical indicated: Even prior to conviction (or trial)—when the presumption of innocence still applies— the Government could constitutionally use §853(e) to freeze assets of an indicted defendant "based on a finding of probable cause to believe that the property will ultimately be proved forfeitable." 491 U. S., at 615. In *Monsanto*, too, the defendant wanted to use the property at issue to pay a lawyer, and maintained that the Fifth and Sixth Amendments entitled him to do so. We disagreed. We first noted that the Government may sometimes "restrain *persons* where there is a finding of probable cause to believe that the accused has committed a serious offense." *Id.*, at 615–616. Given that power, we could find "no constitutional infirmity in §853(e)'s authorization of a similar restraint on [the defendant's] property" in order to protect "the community's interest" in recovering "ill-gotten gains." *Id.*, at 616. Nor did the defendant's interest in retaining a lawyer with the disputed assets change the equation. Relying on *Caplin & Drysdale*, we reasoned: "[I]f the Government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an

order barring a defendant from frustrating that end by dissipating his assets prior to trial." *Ibid.* So again: With probable cause, a freeze is valid.

The Kaleys little dispute that proposition; their argument is instead about who should have the last word as to probable cause. A grand jury has already found probable cause to think that the Kaleys committed the offenses charged; that is why an indictment issued. No one doubts that those crimes are serious enough to trigger forfeiture. Similarly, no one contests that the assets in question derive from, or were used in committing, the offenses. See *supra,* at 5. The only question is whether the Kaleys are constitutionally entitled to a judicial re-determination of the conclusion the grand jury already reached: that probable cause supports this criminal prosecution (or alternatively put, that the prosecution is not "baseless," as the Kaleys believe, *supra*, at 5). And that question, we think, has a ready answer, because a fundamental and historic commitment of our criminal justice system is to entrust those probable cause findings to grand juries.

This Court has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime. See, *e.g.*, *Costello* v. *United States*, 350 U. S. 359, 362 (1956). "[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,'" we have explained, "conclusively determines the existence of probable cause" to believe the defendant perpetrated the offense alleged. *Gerstein* v. *Pugh*, 420 U. S. 103, 117, n. 19 (1975) (quoting *Ex parte United States*, 287 U. S. 241, 250 (1932)). And "conclusively" has meant, case in and case out, just that. We have found no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Costello*, 350 U. S., at 362–363 (quoting *United States* v. *Reed*, 27 F. Cas. 727, 738 (No. 16,134) (CC

NDNY 1852) (Nelson, J.)). To the contrary, "the whole history of the grand jury institution" demonstrates that "a challenge to the reliability or competence of the evidence" supporting a grand jury's finding of probable cause "will not be heard." *United States* v. *Williams*, 504 U. S. 36, 54 (1992) (quoting *Costello*, 350 U. S., at 364, and *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 261 (1988)). The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.

And that inviolable grand jury finding, we have decided, may do more than commence a criminal proceeding (with all the economic, reputational, and personal harm that entails); the determination may also serve the purpose of immediately depriving the accused of her freedom. If the person charged is not yet in custody, an indictment triggers "issuance of an arrest warrant without further inquiry" into the case's strength. *Gerstein*, 420 U. S., at 117, n. 19; see *Kalina* v. *Fletcher*, 522 U. S. 118, 129 (1997). Alternatively, if the person was arrested without a warrant, an indictment eliminates her Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention. See *Gerstein*, 420 U. S., at 114, 117, n. 19. In either situation, this Court—relying on the grand jury's "historical role of protecting individuals from unjust persecution"—has "let [that body's] judgment substitute for that of a neutral and detached magistrate." *Ibid.* The grand jury, all on its own, may effect a pre-trial restraint on a person's liberty by finding probable cause to support a criminal charge.[6]

————————

[6] The grand jury's unreviewed finding similarly may play a significant role in determining a defendant's eligibility for release before trial under the Bail Reform Act of 1984, 18 U. S. C. §3141 *et seq.* That statute creates a rebuttable presumption that a defendant is ineligible for bail if "there is probable cause to believe" she committed certain serious crimes. §§3142(e)(2)–(3), (f). The Courts of Appeal have uni-

Opinion of the Court

The same result follows when, as here, an infringement on the defendant's property depends on a showing of probable cause that she committed a crime. If judicial review of the grand jury's probable cause determination is not warranted (as we have so often held) to put a defendant on trial or place her in custody, then neither is it needed to freeze her property. The grand jury that is good enough— reliable enough, protective enough—to inflict those other grave consequences through its probable cause findings must needs be adequate to impose this one too. Indeed, *Monsanto* already noted the absence of any reason to hold property seizures to different rules: As described earlier, the Court partly based its adoption of the probable cause standard on the incongruity of subjecting an asset freeze to any stricter requirements than apply to an arrest or ensuing detention. See *supra,* at 6; 491 U. S., at 615 ("[I]t

—————

formly held that presumption to operate whenever an indictment charges those offenses. Relying on our instruction that an indictment returned by a proper grand jury "conclusively determines the existence of probable cause," the courts have denied defendants' calls for any judicial reconsideration of that issue. *United States* v. *Contreras*, 776 F. 2d 51, 54 (CA2 1985) (quoting *Gerstein* v. *Pugh*, 420 U. S. 103, 117, n. 19 (1975)); see, *e.g., United States* v. *Suppa*, 799 F. 2d 115, 117–119 (CA3 1986); *United States* v. *Vargas*, 804 F. 2d 157, 162–163 (CA1 1986) (*per curiam*); *United States* v. *Hurtado*, 779 F. 2d 1467, 1477– 1479 (CA11 1985).

The dissent, while conceding this point, notes that courts may consider the "weight of the evidence" in deciding whether a defendant has rebutted the presumption. See *post,* at 9–10, and n. 3 (opinion of ROBERTS, C. J.). And so they may, along with a host of other factors relating to the defendant's dangerousness or risk of flight. See §3142(g). But that is because the Bail Reform Act so allows—not because (as argued here) the Constitution compels the inquiry. And even that provision of the statute cuts *against* the dissent's position, because it enables courts to consider only an evidentiary issue different from the probable cause determination. When it comes to whether probable cause supports a charge—*i.e.,* the issue here—courts making bail determinations are stuck, as all agree, with the grand jury's finding.

would be odd to conclude that the Government may not restrain property" on the showing often sufficient to "restrain *persons*"). By similar token, the probable cause standard, once selected, should work no differently for the single purpose of freezing assets than for all others.[7] So the longstanding, unvarying rule of criminal procedure we have just described applies here as well: The grand jury's determination is conclusive.

And indeed, the alternative rule the Kaleys seek would have strange and destructive consequences. The Kaleys here demand a do-over, except with a different referee. They wish a judge to decide anew the exact question the grand jury has already answered—whether there is probable cause to think the Kaleys committed the crimes charged. But suppose the judge performed that task and came to the opposite conclusion. Two inconsistent findings would then govern different aspects of one criminal proceeding: Probable cause would exist to bring the Kaleys to trial (and, if otherwise appropriate, hold them in prison), but not to restrain their property. And assuming the prosecutor continued to press the charges,[8] the same judge who found probable cause lacking would preside over a

––––––––––

[7] Contrary to the dissent's characterization, see *post,* at 11–12, nothing in our reasoning depends on viewing one consequence of a probable cause determination (say, detention) as "greater" than another (say, the asset freeze here). (We suspect that would vary from case to case, with some defendants seeing the loss of liberty as the more significant deprivation and others the loss of a chosen lawyer.) We simply see no reason to treat a grand jury's probable cause determination as conclusive for all other purposes (including, in some circumstances, locking up the defendant), but not for the one at issue here.

[8] A prosecutor, of course, might drop the case because of the court's ruling, especially if he thought that decision would bring into play an ethical standard barring any charge "that the prosecutor knows is not supported by probable cause." ABA Model Rule of Professional Conduct 3.8(a) (2013). But then the court would have effectively done what we have long held it cannot: overrule the grand jury on whether to bring a defendant to trial. See *supra*, at 7–8.

trial premised on its presence. That legal dissonance, if sustainable at all, could not but undermine the criminal justice system's integrity—and especially the grand jury's integral, constitutionally prescribed role. For in this new world, every prosecution involving a pre-trial asset freeze would potentially pit the judge against the grand jury as to the case's foundational issue.[9]

The Kaleys counter (as does the dissent, *post*, at 7) that apparently inconsistent findings are not really so, because the prosecutor could have presented scantier evidence to the judge than he previously offered the grand jury. Suppose, for example, that at the judicial hearing the prosecutor put on only "one witness instead of all five"; then, the Kaleys maintain, the judge's decision of no probable cause would mean only that "the Government did not satisfy its burden[ ] on that one day in time." Tr. of Oral Arg. 12, 18; see Reply Brief 11–12. But we do not think that hypothetical solves the problem. As an initial matter, it does not foreclose a different fact pattern: A judge could hear the exact same evidence as the grand jury, yet respond to it differently, thus rendering what even the Kaleys must concede is a contradictory finding. And when the Kaleys' hypothetical *is* true, just what does it show? Consider that the prosecutor in their example has left home some of the witnesses he took to the grand jury—presumably because, as we later discuss, he does not yet wish to reveal their identities or likely testimony. See *infra*, at 14–15. The

_____

[9] The dissent argues that the same is true when a judge hears evidence on whether frozen assets are traceable to a crime, because that allegation also appears in the indictment. See *post*, at 6–7; *supra*, at 3, and n. 3. But the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function—to determine whether there is probable cause to think the defendant committed a crime. And a judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself. So that determination does not similarly undermine the grand jury or create internal contradictions within the criminal justice system.

judge's ruling of no probable cause therefore would not mean that the grand jury was wrong: As the Kaleys concede, the grand jury could have heard more than enough evidence to find probable cause that they committed the crimes charged. The Kaleys would win at the later hearing despite, not because of, the case's true merits. And we would then see still less reason for a judge to topple the grand jury's (better supported) finding of probable cause.[10]

Our reasoning so far is straightforward. We held in *Monsanto* that the probable cause standard governs the pre-trial seizure of forfeitable assets, even when they are needed to hire a lawyer. And we have repeatedly affirmed a corollary of that standard: A defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime. In combination, those settled propositions signal defeat for the Kaleys because, in contesting the seizure of their property, they seek only to relitigate such a grand jury finding.

## III

The Kaleys would have us undertake a different analysis, which they contend would lead to a different conclusion. They urge us to apply the balancing test of *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), to assess whether they have received a constitutionally sufficient opportunity to challenge the seizure of their assets. See Brief for Petitioners 32–64. Under that three-pronged test (reordered

_____

[10] The dissent claims as well that the hearing the Kaleys seek "would not be mere relitigation" of the grand jury's decision because they could now "tell their side of the story." *Post*, at 8. But the same could be said of an adversarial hearing on an indictment's validity, which everyone agrees is impermissible because it "look[s] into and revise[s]" the grand jury's judgment. See *ibid.* (quoting *Costello* v. *United States,* 350 U. S. 359, 362 (1956)). The lesson of our precedents, as described above, is that a grand jury's finding is "conclusive"—and thus precludes subsequent proceedings on the same matter—even though not arising from adversarial testing. See *supra,* at 7–8; see also *infra*, at 17–18.

here for expositional purposes), a court must weigh (1) the burdens that a requested procedure would impose on the Government against (2) the private interest at stake, as viewed alongside (3) "the risk of an erroneous deprivation" of that interest without the procedure and "the probable value, if any, of [the] additional . . . procedural safeguard[ ]." *Mathews*, 424 U. S., at 335. Stressing the importance of their interest in retaining chosen counsel, the Kaleys argue that the *Mathews* balance tilts hard in their favor. It thus overrides—or so the Kaleys claim— all we have previously held about the finality of grand jury findings, entitling them to an evidentiary hearing before a judge to contest the probable cause underlying the indictment.

The Government battles with the Kaleys over whether *Mathews* has any application to this case. This Court devised the test, the Government notes, in an administrative setting—to decide whether a Social Security recipient was entitled to a hearing before her benefits were terminated. And although the Court has since employed the approach in other contexts, the Government reads *Medina* v. *California*, 505 U. S. 437 (1992), as foreclosing its use here. In that case, we held that "the *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which . . . are part of the criminal process," reasoning that because the "Bill of Rights speaks in explicit terms to many aspects of criminal procedure," the Due Process Clause "has limited operation" in the field. *Id.*, at 443. That settles that, asserts the Government. See Brief for United States 18. But the Kaleys argue that *Medina* addressed a *State's* procedural rule and relied on federalism principles not implicated here. Further, they claim that *Medina* concerned a criminal proceeding proper, not a collateral action seizing property. See Reply Brief 1–5. As to that sort of action, the Kaleys contend, *Mathews* should govern.

We decline to address those arguments, or to define the respective reach of *Mathews* and *Medina*, because we need not do so. Even if *Mathews* applied here—even if, that is, its balancing inquiry were capable of trumping this Court's repeated admonitions that the grand jury's word is conclusive—the Kaleys still would not be entitled to the hearing they seek. That is because the *Mathews* test tips against them, and so only reinforces what we have already said. As we will explain, the problem for the Kaleys comes from *Mathews*' prescribed inquiry into the requested procedure's usefulness in correcting erroneous deprivations of their private interest. In light of *Monsanto*'s holding that a seizure of the Kaleys' property is erroneous only if unsupported by probable cause, the added procedure demanded here is not sufficiently likely to make any difference.

To begin the *Mathews* analysis, the Government has a substantial interest in freezing potentially forfeitable assets without an evidentiary hearing about the probable cause underlying criminal charges. At the least, such an adversarial proceeding—think of it as a pre-trial mini-trial (or maybe a pre-trial not-so-mini-trial)—could consume significant prosecutorial time and resources. The hearing presumably would rehearse the case's merits, including the Government's theory and supporting evidence. And the Government also might have to litigate a range of ancillary questions relating to the conduct of the hearing itself (for example, could the Kaleys subpoena witnesses or exclude certain evidence?).

Still more seriously, requiring a proceeding of that kind could undermine the Government's ability either to obtain a conviction or to preserve forfeitable property. To ensure a favorable result at the hearing, the Government could choose to disclose all its witnesses and other evidence. But that would give the defendant knowledge of the Government's case and strategy well before the rules of crimi-

nal procedure—or principles of due process, see, *e.g.*, *Brady* v. *Maryland*, 373 U. S. 83 (1963)—would otherwise require. See Fed. Rules Crim. Proc. 26.2(a), 16(a)(2); *Weatherford* v. *Bursey*, 429 U. S. 545, 559–561 (1977) ("There is no general constitutional right to discovery in a criminal case"). And sometimes (particularly in organized crime and drug trafficking prosecutions, in which forfeiture questions often arise), that sneak preview might not just aid the defendant's preparations but also facilitate witness tampering or jeopardize witness safety. Alternatively, to ensure the success of its prosecution, the Government could hold back some of its evidence at the hearing or give up on the pre-trial seizure entirely. But if the Government took that tack, it would diminish the likelihood of ultimately recovering stolen assets to which the public is entitled.[11] So any defense counsel worth his salt—whatever the merits of his case—would put the prosecutor to a choice: "Protect your forfeiture by providing discovery" *or* "protect your conviction by surrendering the assets."[12] It is small wonder that the Government

_____

[11] The dissent says not to worry—the Government can obtain the assets after conviction by using 21 U. S. C. §853(c)'s "relation-back" provision. See *post,* at 15. That provision is intended to aid the Government in recovering funds transferred to a third party—here, the Kaleys' lawyer—subsequent to the crime. But forfeiture applies only to specific assets, so in the likely event that the third party has spent the money, the Government must resort to a State's equitable remedies—which may or may not even be available—to force him to disgorge an equivalent amount. See Tr. of Oral Arg. 48–49. And indeed, if the Government *could* easily recover such monies, then few lawyers would agree to represent defendants like the Kaleys, and the dissent's proposed holding would be for naught.

[12] Compare Cassella, Criminal Forfeiture Procedure, 32 Am. J. Crim. L. 55, 63 (2004) (explaining that "defendants tend to demand the hearing . . . to afford defense counsel an early opportunity to discover the nature of the Government's criminal case and to cross-examine some of the Government's witnesses") with May, Attorney Fees and Government Forfeiture, 34 Champion 20, 23 (Apr. 2010) (advising that

wants to avoid that lose-lose dilemma.

For their part, however, defendants like the Kaleys have a vital interest at stake: the constitutional right to retain counsel of their own choosing. See *Wheat* v. *United States*, 486 U. S. 153, 159 (1988) (describing the scope of, and various limits on, that right). This Court has recently described that right, separate and apart from the guarantee to effective representation, as "the root meaning" of the Sixth Amendment. *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 147–148 (2006); cf. *Powell* v. *Alabama*, 287 U. S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice").[13] Indeed, we have held that the wrongful deprivation of choice of counsel is "structural error," immune from review for harmlessness, because it "pervades the entire trial." *Gonzalez-Lopez*, 548 U. S., at 150. Different lawyers do all kinds of things differently, sometimes "affect[ing] whether and on what terms the defendant . . . plea bargains, or decides instead to go to trial"—and if the latter, possibly affecting whether she gets convicted or what sentence she receives. *Ibid.* So for defendants like the Kaleys, having

---

"[e]ven if defense counsel cannot prevail on the facts or the law, he may be able to prevail anyway" because "[s]ometimes the government will decide to give up its restraint on a piece of property rather than engage in litigation that will result in early discovery").

[13] Still, a restraint on assets could not deprive the Kaleys of representation sufficient to ensure fair proceedings. The Sixth Amendment would require the appointment of effective counsel if the Kaleys were unable to hire a lawyer. See *Strickland* v. *Washington*, 466 U. S. 668 (1984); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963). The vast majority of criminal defendants proceed with appointed counsel. And the Court has never thought, as the dissent suggests today, that doing so risks the "fundamental fairness of the actual trial." *Post*, at 12; see *post*, at 17–18. If it does, the right way to start correcting the problem is not by adopting the dissent's position, but by ensuring that the right to effective counsel is fully vindicated.

the ability to retain the "counsel [they] believe[ ] to be best"—and who might in fact be superior to any existing alternatives—matters profoundly. *Id.*, at 146.

And yet *Monsanto* held, crucially for the last part of our *Mathews* analysis, that an asset freeze depriving a defendant of that interest is *erroneous* only when unsupported by a finding of probable cause. Recall that *Monsanto* considered a case just like this one, where the defendant wanted to use his property to pay his preferred lawyer. He urged the Court to hold that the Government could seize assets needed for that purpose only after conviction. But we instead decided that the Government could act "after probable cause [that the assets are forfeitable] is adequately established." 491 U. S., at 616. And that means in a case like this one—where the assets' connection to the allegedly illegal conduct is not in dispute, see *supra*, at 5—that a pre-trial seizure is wrongful only when there is no probable cause to believe the defendants committed the crimes charged. Or to put the same point differently, such a freeze is erroneous—notwithstanding the weighty burden it imposes on the defendants' ability to hire a chosen lawyer—only when the grand jury should never have issued the indictment.

The *Mathews* test's remaining prong—critical when the governmental and private interests both have weight—thus boils down to the "probable value, if any," of a judicial hearing in uncovering mistaken grand jury findings of probable cause. 424 U. S., at 335. The Kaleys (and the dissent) contend that such proceedings will serve an important remedial function because grand juries hear only a "one-sided presentation[ ]" of evidence. Brief for Petitioners 57; see *post*, at 16. And that argument rests on a generally sound premise: that the adversarial process leads to better, more accurate decision-making. But in this context—when the legal standard is merely probable cause and the grand jury has already made that finding—

both our precedents and other courts' experience indicate that a full-dress hearing will provide little benefit.

This Court has repeatedly declined to require the use of adversarial procedures to make probable cause determinations. Probable cause, we have often told litigants, is not a high bar: It requires only the "kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida* v. *Harris*, 568 U. S. __, __ (2013) (slip op., at 5) (quoting *Illinois* v. *Gates*, 462 U. S. 213, 231, 238 (1983)); see *Gerstein*, 420 U. S., at 121 (contrasting probable cause to reasonable-doubt and preponderance standards). That is why a grand jury's finding of probable cause to think that a person committed a crime "can be [made] reliably without an adversary hearing," *id.*, at 120; it is and "has always been thought sufficient to hear only the prosecutor's side," *United States* v. *Williams*, 504 U. S. 36, 51 (1992). So, for example, we have held the "confrontation and cross-examination" of witnesses unnecessary in a grand jury proceeding. *Gerstein*, 420 U. S., at 121–122. Similarly, we have declined to require the presentation of exculpatory evidence, see *Williams*, 504 U. S., at 51, and we have allowed the introduction of hearsay alone, see *Costello*, 350 U. S., at 362–364. On each occasion, we relied on the same reasoning, stemming from our recognition that probable cause served only a gateway function: Given the relatively undemanding "nature of the determination," the value of requiring any additional "formalities and safeguards" would "[i]n most cases . . . be too slight." *Gerstein*, 420 U. S., at 121–122.

We can come out no differently here. The probable cause determinations the Kaleys contest are simply those underlying the charges in the indictment. No doubt the Kaleys could seek to poke holes in the evidence the Government offered the grand jury to support those allegations. No doubt, too, the Kaleys could present evidence of their own, which might cast the Government's in a differ-

ent light. (Presumably, the Kaleys would try in those two ways to show that they did not steal, but instead lawfully obtained the medical devices they later resold. See *supra*, at 4.) Our criminal justice system of course relies on such contestation at trial when the question becomes whether a defendant is guilty beyond peradventure. But as we have held before, an adversarial process is far less useful to the threshold finding of probable cause, which determines only whether adequate grounds exist to proceed to trial and reach that question. The probable cause decision, by its nature, is hard to undermine, and still harder to reverse. So the likelihood that a judge holding an evidentiary hearing will repudiate the grand jury's decision strikes us, once more, as "too slight" to support a constitutional requirement. *Gerstein*, 420 U. S., at 122.

The evidence from other courts corroborates that view, over and over and over again. In the past two decades, the courts in several Circuits have routinely held the kind of hearing the Kaleys seek. See *supra*, at 3, and n. 4. Yet neither the Kaleys nor their *amici* (mostly lawyers' associations) have found a single case in which a judge found an absence of probable cause to believe that an indicted defendant committed the crime charged. One *amicus* cites 25 reported cases involving pre-trial hearings on asset freezes. See Brief for New York Council of Defense Lawyers 4, n. 2. In 24 of those, the defendant lost outright. The last involved a not-yet-indicted defendant (so no grand jury finding); there, the District Court's ruling for him was reversed on appeal. See Tr. of Oral Arg. 15, 36. To be sure, a kind of selection bias might affect those statistics: Perhaps a prosecutor with a very weak case would choose to abandon an asset freeze rather than face a difficult hearing. See *id.*, at 16, 37. But the Kaleys and their *amici* have also failed to offer any anecdotes of that kind; and we suspect that the far more common reason a prosecutor relinquishes a freeze is just to avoid premature

discovery. See *supra*, at 14–15. So experience, as far as anyone has discerned it, cuts against the Kaleys: It confirms that even under *Mathews*, they have no right to revisit the grand jury's finding.[14]

## IV

When we decided *Monsanto*, we effectively resolved this case too. If the question in a pre-trial forfeiture case is whether there is probable cause to think the defendant committed the crime alleged, then the answer is: whatever the grand jury decides. And even if we test that proposition by applying *Mathews*, we arrive at the same place: In considering such findings of probable cause, we have never thought the value of enhanced evidentiary procedures worth their costs. Congress of course may strike its own balance and give defendants like the Kaleys the kind of hearing they want. Indeed, Congress could disapprove of *Monsanto* itself and hold pre-trial seizures of property to a higher standard than probable cause. But the Due Pro-

──────────

[14]As against all this—all we have formerly held and all other courts have actually found—the dissent cites nothing: not a single decision of ours suggesting, nor a single decision of a lower court demonstrating, that formal, adversarial procedures are at all likely to correct any grand jury errors. The dissent argues only that a hearing will have "probable value" for the Kaleys because "the deprivation of [their] right" to chosen counsel, once accomplished, is "effectively permanent." *Post*, at 16. But that argument confuses two different parts of the *Mathews* inquiry. The dissent's point well underscores the importance of the Kaleys' interest: As we have readily acknowledged, if the grand jury made a mistake, the Kaleys have suffered a serious injury, which cannot later be corrected. See *supra*, at 16–17. (We note, though, that the dissent, in asserting that injury's uniqueness, understates the losses that always attend a mistaken indictment, which no ultimate verdict can erase.) But the dissent's argument about what is at stake for the Kaleys says nothing about the crucial, last prong of *Mathews*, which asks whether and to what extent the adversarial procedures they request will in fact correct any grand jury errors. That part of the analysis is what requires our decision, and the dissent's view that the Government overreached in this particular case cannot overcome it.

cess Clause, even when combined with a defendant's Sixth Amendment interests, does not command those results. Accordingly, the Kaleys cannot challenge the grand jury's conclusion that probable cause supports the charges against them. The grand jury gets the final word.

We therefore affirm the judgment of the Eleventh Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–464

### KERRI L. KALEY, ET VIR, PETITIONERS *v.* UNITED STATES

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT*

[February 25, 2014]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, dissenting.

An individual facing serious criminal charges brought by the United States has little but the Constitution and his attorney standing between him and prison. He might readily give all he owns to defend himself.

We have held, however, that the Government may effectively remove a defendant's primary weapon of defense—the attorney he selects and trusts—by freezing assets he needs to pay his lawyer. That ruling is not at issue. But today the Court goes further, holding that a defendant may be hobbled in this way without an opportunity to challenge the Government's decision to freeze those needed assets. I cannot subscribe to that holding and respectfully dissent.

I

The facts of this case are important. They highlight the significance to a defendant of being able to hire his counsel of choice, and the potential for unfairness inherent in giving the prosecutor the discretion to take that right away. Kerri Kaley worked as a sales representative for a Johnson & Johnson subsidiary, selling prescription medical devices. Kaley and other sales representatives occasionally obtained outmoded or surplus devices from staff

members at the medical facilities they served, when, for example, those devices were no longer needed because they had been superseded by newer models. Kaley sold the unwanted devices to a Florida company, dividing the proceeds among the sales representatives.

Kaley learned in January 2005 that a federal grand jury was investigating those activities as a conspiracy to sell stolen prescription medical devices. Kaley and her husband (who allegedly helped ship the products to Florida) retained counsel, who immediately set to work preparing their defense against any impending charges. Counsel regularly discussed the investigation with the Kaleys, helped review documents demanded by the grand jury, and met with prosecutors in an attempt to ward off an indictment. Nonetheless preparing for the worst, the Kaleys applied for a $500,000 equity line of credit on their home to pay estimated legal fees associated with a trial. They used that money to purchase a $500,000 certificate of deposit, which they set aside until it would be needed to pay their attorneys for the trial.

In February 2007, the grand jury returned a seven-count indictment charging the Kaleys and another sales representative, Jennifer Gruenstrass, with violations of federal law. The indictment alleged that a "money judgment" of over $2 million and the $500,000 certificate of deposit were subject to forfeiture under 18 U. S. C. §981(a)(1)(C) because those assets constituted "proceeds" of the alleged crimes. Armed with this indictment, the prosecution obtained an *ex parte* order pursuant to 21 U. S. C. §853(e), thereby freezing all of the Kaleys' assets listed in the indictment, including the certificate of deposit set aside for legal fees. The Government did not seek to freeze any of Gruenstrass's assets.

The Kaleys moved to vacate the order, requesting a hearing at which they could argue that there was no probable cause to believe their assets were forfeitable, because

their alleged conduct was not criminal. They argued they were entitled to such a hearing because the restraining order targeted funds they needed and had set aside to retain for trial the same counsel who had been preparing their defense for two years. And they contended that the prosecution was baseless because the Government could not identify anyone who claimed ownership of the medical devices alleged to have been "stolen." During a telephone conference with a Magistrate Judge on the motion, the prosecution conceded that it had been able to trace only $140,000 in allegedly criminal proceeds to the Kaleys, which led the Magistrate Judge to question the lawfulness of restraining the listed assets.

Just two business days after that conference, the Government obtained a superseding indictment that added a count of conspiracy to commit money laundering under 18 U. S. C. §1956(h). Adding that charge enabled the Government to proceed under a much broader forfeiture provision than the one in the original indictment. While the civil forfeiture provision in §981(a)(1)(C) authorized forfeiture of property that "constitutes or is derived from proceeds traceable to" a qualifying criminal violation, the criminal forfeiture provision now invoked by the Government—§982(a)(1)—authorizes forfeiture of property "involved in" a qualifying offense, or "any property traceable to such property." The superseding indictment alleged that a sum of more than $2 million, the certificate of deposit reserved to pay legal expenses, and now the Kaleys' home were subject to forfeiture. And again, the Government sought an order freezing substantially all those assets.

The Kaleys objected, repeating the arguments they had previously raised, and also contending that the prosecutors were being vindictive in adding the money laundering charge and seeking broader forfeiture. The District Court nonetheless entered the broader order requested by the

Government, and the restraint on the Kaleys' assets remains in place.

While the Kaleys' appeal from that denial was pending, the Government proceeded to trial separately against their codefendant Gruenstrass. As the Government had not sought to freeze Gruenstrass's assets, she was represented by her chosen counsel. Her counsel argued that the Government was pitching a fraud without a victim, because no Government witness took the stand to claim ownership of the allegedly stolen devices. The jury acquitted Gruenstrass on all charges in less than three hours—a good omen for the Kaleys and their counsel as they prepared for their own trial.

## II

The issues at stake here implicate fundamental constitutional principles. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In many ways, this is the most precious right a defendant has, because it is his attorney who will fight for the other rights the defendant enjoys. *United States* v. *Cronic*, 466 U. S. 648, 653–654 (1984). And more than 80 years ago, we found it "hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell* v. *Alabama*, 287 U. S. 45, 53 (1932).

Indeed, we recently called the "right to select counsel of one's choice . . . . the root meaning of the constitutional guarantee" of the Sixth Amendment. *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 147–148 (2006). The Amendment requires "that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." *Id.,* at 146. An individual's right to counsel of choice is violated "*whenever* the defendant's choice is wrongfully denied," and such

error "pervades the entire trial." *Id.,* at 150. A violation of this right is therefore a "structural error," *ibid.*; that is, one of the very few kinds of errors that "undermine the fairness of a criminal proceeding as a whole." *United States* v. *Davila*, 569 U. S. ___, ___ (2013) (slip op., at 12).

It is of course true that the right to counsel of choice is (like most rights) not absolute. A defendant has no right to choose counsel he cannot afford, counsel who is not a member of the bar, or counsel with an impermissible conflict of interest. *Wheat* v. *United States*, 486 U. S. 153, 159 (1988). And a district court need not always shuffle its calendar to accommodate a defendant's preferred counsel if it has legitimate reasons not to do so. *Morris* v. *Slappy*, 461 U. S. 1, 11–12 (1983). But none of those limitations is imposed at the unreviewable discretion of a prosecutor—the party who wants the defendant to lose at trial.

This Court has held that the prosecution may freeze assets a defendant needs to retain his counsel of choice upon "a finding of probable cause to believe that the assets are forfeitable." *United States* v. *Monsanto*, 491 U. S. 600, 615 (1989). The Kaleys do not challenge that holding here. But the Court in *Monsanto* acknowledged and reserved the crucial question whether a defendant had the right to be heard before the Government could take such action. *Id.,* at 615, n. 10.[1]

There was good reason for that caution. The possibility that a prosecutor could elect to hamstring his target by preventing him from paying his counsel of choice raises substantial concerns about the fairness of the entire proceeding. "A fair trial in a fair tribunal is a basic require-

———————

[1] Because the District Court in *Monsanto* had imposed the restraining order after an "extensive, 4-day hearing on the question of probable cause," it was "pointless" for this Court to decide whether a hearing was required to "adequately establish[]" probable cause. 491 U. S., at 615, n. 10, 616.

ment of due process." *In re Murchison*, 349 U. S. 133, 136 (1955). Issues concerning the denial of counsel of choice implicate the overall fairness of the trial because they "bear[] directly on the 'framework within which the trial proceeds.'" *Gonzalez-Lopez*, *supra*, at 150 (quoting *Arizona* v. *Fulminante*, 499 U. S. 279, 310 (1991)).

## III

Notwithstanding the substantial constitutional issues at stake, the majority believes that syllogistic-type reasoning effectively resolves this case. *Ante*, at 12. The majority's reasoning goes like this: First, to freeze assets prior to trial, the Government must show probable cause to believe that a defendant has committed an offense giving rise to forfeiture. Second, grand jury determinations of probable cause are nonreviewable. Therefore, the Kaleys cannot "relitigate [the] grand jury finding" of probable cause to avoid a pretrial restraint of assets they need to retain their counsel of choice. *Ibid.* I do not view the matter as nearly so "straightforward," and neither did the multiple Courts of Appeals since *Monsanto* that have granted defendants the type of hearing the Kaleys request. See *ante*, at 3, n. 4.

To begin with, the majority's conclusion is wrong on its own terms. To freeze assets prior to trial, the Government must show probable cause to believe both that (1) a defendant has committed an offense giving rise to forfeiture and (2) the targeted assets have the requisite connection to the alleged criminal conduct. 21 U. S. C. §853(e)(1)(A). The Solicitor General concedes—and *all* Courts of Appeals to have considered the issue have held—that "defendants are entitled to show that the assets that are restrained are not actually the proceeds of the charged criminal offense," Tr. of Oral Arg. 45; that is, that the second prong of the required showing is not satisfied. But by listing property in the indictment and alleging that it is subject to

forfeiture—as required to restrain assets before trial under §853(e)(1)(A)—the grand jury found probable cause to believe those assets were linked to the charged offenses, just as it found probable cause to believe the Kaleys committed the underlying crimes. App. 60–61 (separate indictment section alleging criminal forfeiture, including of the certificate of deposit); see *United States* v. *Jones*, 160 F. 3d 641, 645 (CA10 1998); *United States* v. *Monsanto*, 924 F. 2d 1186, 1197 (CA2 1991) (en banc); Dept. of Justice, Asset Forfeiture Policy Manual 128 (2013) ("That the indictment alleges that property is subject to forfeiture indicates that the grand jury has made a probable cause determination."). Neither the Government nor the majority gives any reason why the District Court may reconsider the grand jury's probable cause finding as to traceability— and in fact constitutionally *must*, if asked—but may not do so as to the underlying charged offenses.[2]

In any event, the hearing the Kaleys seek would not be mere relitigation of the grand jury proceedings. At that hearing, the District Court would consider the merits of the prosecution to determine whether there is probable cause to believe the Kaleys' assets are forfeitable, not to determine whether the Kaleys may be tried at all. If the judge agrees with the Kaleys, he will merely hold that the Government has not met its burden at that hearing to justify freezing the assets the Kaleys need to pay their attorneys. The Government may proceed with the prose-

———————
[2] The majority's only response is to characterize the grand jury's finding of traceability as merely a "technical matter." *Ante,* at 11, n. 9. But the indictment draws no distinction between the grand jury's finding of probable cause to believe that the Kaleys committed a crime and its finding of probable cause to believe that certain assets are traceable to that crime. Both showings must be made to justify a pretrial asset restraint under *Monsanto*, and there is nothing in that case or the indictment that justifies treating one grand jury finding differently than the other.

cution, but the Kaleys will have their chosen counsel at their side.

Even though the probable cause standard applies at both the indictment stage and the pretrial asset restraint hearing, the judge's determination will be based on different evidence than that previously presented to the grand jury. For its part, the Government may choose to put on more or less evidence at the hearing than it did before the grand jury. And of course the Kaleys would have the opportunity to tell their side of the story—something the grand jury never hears. See *United States* v. *Williams*, 504 U. S. 36, 51–52 (1992). Here, much of what the Kaleys want to present comes from Gruenstrass's trial— evidence that the grand jury obviously could not have considered. So even if the judge determined that probable cause to justify the pretrial asset restraint had not been adequately established, that determination would not in any way amount to "looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Ante,* at 7 (quoting *Costello* v. *United States*, 350 U. S. 359, 362–363 (1956) (internal quotation marks omitted)). The judge's decision based on the evidence presented at the hearing would have no necessary legal or logical consequence for the underlying prosecution because it would be based on different evidence and used for a different purpose.

The majority warns that allowing a judge to consider the underlying merits of the prosecution for purposes of determining whether a defendant's assets may be restrained pretrial could create "legal dissonance" with the grand jury's indictment, which "could not but undermine the criminal justice system's integrity." *Ante,* at 10–11. But as explained, such a judicial finding based on different evidence with both sides present would not contradict the grand jury's probable cause finding based on what was

before it. That finding would still suffice to accomplish *its* purpose—to call for a trial on the merits of the charges. Rather than creating "dissonance," the traditional roles of the principal actors in our justice system would remain respected: The grand jury decides whether a defendant should be required to stand trial, the judge decides pretrial matters and how the trial should proceed, and the jury decides whether the defendant is guilty of the crime.

Indeed, in the bail context—the pretrial determination that is perhaps the closest analogue to the pretrial restraint of assets at issue here—we allow judicial inquiries into the underlying merits of the indicted charges, without concern about intruding into the province of the grand jury. An indictment charging sufficiently serious crimes gives rise to a rebuttable presumption that a defendant is not eligible for pretrial release. See 18 U. S. C. §§3142(e)(3) and (f). Such a defendant is nonetheless entitled to an evidentiary hearing at which he may contest (among other things) "the weight of the evidence against" him, §3142(g)(2). Yet no one would say that the district court encroached on the grand jury's role if the court determined that it would not authorize pretrial detention because of the weakness of the prosecution's case. See, *e.g.*, *United States* v. *Hurtado*, 779 F. 2d 1467, 1479–1480 (CA11 1985) (recognizing that in considering the "weight of the evidence" to decide whether the presumption is rebutted, "it may well be necessary to open up the issue of probable cause since that too is a question of evidentiary weight"). That makes sense, because the district court has considered the underlying merits of the charges based on different information and for a different purpose than the grand jury did. Such a defendant would be granted pretrial release, but would still have to show up for trial.[3]

—————

[3] The majority cites cases in which courts have correctly rejected requests for a judicial redetermination of the grand jury's probable cause

In any event, few things could do more to "undermine the criminal justice system's integrity," *ante*, at 11, than to allow the Government to initiate a prosecution and then, at its option, disarm its presumptively innocent opponent by depriving him of his counsel of choice—without even an opportunity to be heard. That is the result of the Court's decision in this case, and it is fundamentally at odds with our constitutional tradition and basic notions of fair play.

## IV

The majority is no more persuasive in applying the due process balancing test set forth in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976).[4] As an initial matter, the majority

---

finding for purposes of determining whether the *rebuttable presumption* of pretrial detention is triggered. See *ante,* at 8–9, n. 6. But those cases do not question the judge's authority to consider the underlying merits of the Government's case (including what the grand jury has alleged in the indictment) for purposes of determining whether that presumption has been rebutted. *E.g., United States* v. *Dominguez*, 783 F. 2d 702, 706 (CA7 1986) ("evidence probative of guilt is admitted at a detention hearing only to support or challenge the weight of the government's case against the defendant"); see also *United States* v. *Jones*, 583 F. Supp. 2d 513, 517 (SDNY 2008) (releasing a defendant pretrial after determining that "the weight of the evidence now overcomes the presumption of detention"). The majority notes that this inquiry in the bail context is authorized by statute, but that does not alter the crucial point: Where the prosecutor seeks to use the indictment to impose another significant pretrial consequence on a defendant, judges are allowed to inquire into the underlying merits of the prosecution (including the very same matters the grand jury has considered) as part of the inquiry into whether that consequence is justified, and that has not resulted in "dissonance" or the undermining of the grand jury's role.

[4] Under our due process precedents, it is clear that the *Mathews* test applies in this case, rather than the inquiry set forth in *Medina* v. *California*, 505 U. S. 437 (1992). We held in *Medina* that *Mathews* is inapplicable when "assessing the validity of state procedural rules" that "are part of the criminal process." *Id.,* at 443. We have therefore applied *Medina* rather than *Mathews* only when considering such due process challenges, including, for example, the allocation of burdens of proof or what type of evidence may be admitted. See, *e.g., id.,* at 443–

gives short shrift to the Kaleys' interests at stake. "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle* v. *Williams*, 425 U. S. 501, 503 (1976). Whatever serious crimes the grand jury alleges the Kaleys committed, they are presumptively innocent of those charges until final judgment. Their right to vindicate that presumption by choosing the advocate they believe will best defend them is, as explained, at the very core of the Sixth Amendment.

I suspect that, for the Kaleys, that right could hardly be more precious than it is now. In addition to potentially losing the property the Government has already frozen— including their home—the Kaleys face maximum prison terms of five years (18 U. S. C. §371), ten years (§2314), and 20 years (§1956(h)) for the charges in the superseding indictment. The indictment means they must stand trial on those charges. But the Kaleys plainly have an urgent interest in having their chosen counsel—who has worked with them since the grand jury's investigation began, two years before the indictment—mount their best possible defense at trial.

The majority alludes to our cases recognizing that indictments may result in the temporary deprivation of a defendant's liberty without judicial review, and suggests that indictments therefore must also be "good enough" to deprive a defendant of property without judicial review. *Ante*, at 9–10. Even if this greater-includes-the-lesser

---

446 (burden of proving incompetence to stand trial); *Patterson* v. *New York*, 432 U. S. 197, 202 (1977) (burden of proving affirmative defense); *Dowling* v. *United States*, 493 U. S. 342, 352 (1990) (admissibility of testimony about a prior crime of which the defendant was acquitted). This case is not about such questions, but about the collateral issue of the pretrial deprivation of property a defendant needs to exercise his right to counsel of choice. *Mathews* therefore provides the relevant inquiry.

reasoning might be valid in other contexts, it is not when the property at issue is needed to hire chosen counsel. In the context of a prosecution for serious crimes, it is far from clear which interest is greater—the interest in temporary liberty pending trial, or the interest in using one's available means to avoid imprisonment for many years after trial. Retaining one's counsel of choice ensures the fundamental fairness of the actual trial, and thus may be far more valuable to a criminal defendant than pretrial release.

As for the Government's side, the Court echoes the Government's concerns that a hearing would place demands on its resources and interfere with its desire to keep its trial strategy close to the vest. These concerns are somewhat curious in light of the majority's emphasis on how easy it is to make a probable cause showing. And they are even more surprising in light of the extensive discovery obligations already imposed on the Government by Federal Rule of Criminal Procedure 16 and *Brady* v. *Maryland*, 373 U. S. 83 (1963). The emphasis the Government places on pretrial secrecy evokes an outdated conception of the criminal trial as "a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams* v. *Florida*, 399 U. S. 78, 82 (1970).

Moreover, recall that the Government concedes that due process guarantees defendants a hearing to contest the traceability of the restrained assets to the charged conduct. If a defendant requests such a hearing, the Government will likely be required to reveal something about its case to demonstrate that the assets have the requisite connection to the charged offenses.

In any event, these concerns are exaggerated. What the Government would be required to show in a pretrial restraint hearing is similar to pretrial showings prosecutors make in other contexts on a daily basis. As mentioned

above, when the Government seeks an order detaining a defendant pending trial, it routinely makes an extensive evidentiary showing—voluntarily disclosing much of its evidence and trial strategy—in support of that relief. See Brief for California Attorneys for Criminal Justice as *Amicus Curiae* 11–18. The Government makes similar showings in the context of other pretrial motions, such as motions to admit hearsay evidence under the co-conspirator exception, or to discover attorney-client communications made in furtherance of a future crime. *Id.,* at 19–28.

In those contexts, as in this one, the decision how much to "show its hand" rests fully within the Government's discretion. If it has a strong case and believes that pretrial restraint is necessary to preserve the assets for forfeiture, the Government may choose to make a strong evidentiary showing and have little concern about doing so. In a closer case, where the Government is more concerned about tipping its hand, it may elect to forgo a pretrial restraint of those assets the defendant needs to pay his counsel. I see no great burden on the Government in allowing it to strike this balance as it sees fit when considering a pretrial asset restraint that would deprive a defendant of his right to counsel of choice. In the end, it is a bit much to argue that the Government has discretion to deprive a defendant—without a hearing—of the counsel he has chosen to present his defense, simply to avoid the mere possibility of a premature peek at some aspect of what the Government intends to do at trial.

The majority also significantly underestimates the amount of control judges can exercise in these types of hearings. The Circuits that allow such hearings have afforded judges a great deal of flexibility in structuring them. Judges need not apply the Federal Rules of Evidence during the hearings, and they can take many steps, including *in camera* proceedings, to ensure that witness

safety and grand jury secrecy are fully preserved. See *Monsanto*, 924 F. 2d, at 1198; *United States* v. *E-Gold, Ltd.*, 521 F. 3d 411, 418–419 (CADC 2008).

Moreover, experience in the Second Circuit, where defendants have for more than 20 years been afforded the type of hearing the Kaleys seek, indicates that such hearings do not occur so often as to raise substantial concerns about taxing the resources of the Government and lower courts. See Brief for New York Council of Defense Lawyers as *Amicus Curiae* 4–9. As the majority notes, only 25 reported cases appear to have addressed such hearings. *Id.*, at 4. This relative rarity is unsurprising. To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice. See *United States* v. *Bonventre*, 720 F. 3d 126, 131 (CA2 2013). And defendants too have an incentive not to tip their hands as to trial strategy—perhaps to an even greater extent than the Government, given that defendants bear comparatively few discovery obligations at a criminal trial. In light of the low bar of the probable cause standard, many defendants likely conclude that the possible benefits of the hearing are not worth the candle.

For those hearings that do occur, they are by all appearances ably controlled by district judges to keep them manageable and to limit the potential for excess or abuse. See Brief for New York Council of Defense Lawyers as *Amicus Curiae* 6–8. In addition, where such hearings are allowed, prosecutors and defense counsel often reach agreements concerning the scope and conditions of any protective order that accommodate the interests of both sides. See *id.*, at 8–9. When the right at stake is as fundamental as hiring one's counsel of choice—the "root meaning" of the Sixth Amendment, *Gonzalez-Lopez*, 548 U. S., at 147–148—the Government's interest in saving the time and expense of a limited number of such proceedings is not particularly compelling.

The Government does have legitimate interests that are served by forfeiture of allegedly tainted assets. *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 629 (1989). And imposing a pretrial restraint on such assets does increase the likelihood that they will be available if the defendant is convicted.[5] But that interest is protected in other ways that mitigate the concern that defendants will successfully divert forfeitable assets from the Government's reach if afforded a hearing. The relation-back provision in 21 U. S. C. §853(c) provides that title to forfeitable assets, once adjudged forfeitable, vests in the Government as of the time the offense was committed. Section 853(c) then provides that the Government may seek a "special verdict of forfeiture" as to any forfeited property that was subsequently transferred to a third party. The Government protests that recovery of such assets will often be complicated and subject to the vagaries of state law. Tr. of Oral Arg. 49–50. But such complaints of administrative inconvenience carry little weight in this particular context, when the Government knows exactly where the money has gone: to an attorney who is, after all, an officer of the court, and on notice that the Government claims title to the assets.

And we are not talking about all of a defendant's assets that are subject to forfeiture—only those that the defendant can show are necessary to secure his counsel of choice.

—————

[5] The Government and the majority place particular emphasis on the use of forfeited assets to provide restitution to victims of crime. See Brief for United States 41–42, and n. 14; *ante,* at 2, n. 1. It is worth noting in this respect that in prosecuting the other sales representatives that participated with the Kaleys in the allegedly fraudulent conduct, the Government's position as to who exactly is the "victim" has shifted frequently. See Brief for Petitioners 9–11 (hospitals); *id.,* at 18, 21–23 (their employers); Tr. of Oral Arg. 43–44 (hospitals). As one prosecutor forthrightly acknowledged at the sentencing hearing of an alleged co-conspirator, "we can't make restitution." Brief for Petitioners 11.

Here, for example, the Kaleys have identified as needed to pay counsel only a discrete portion of the assets the Government seeks. The statistics cited by the Court on the total amount of assets recovered by the Government and provided as restitution for victims, *ante,* at 2, n. 1, are completely beside the point.

The majority ultimately concludes that a pretrial hearing of the sort the Kaleys seek would be a waste of time. *Ante*, at 17–20. No. It takes little imagination to see that seizures based entirely on *ex parte* proceedings create a heightened risk of error. Common sense tells us that secret decisions based on only one side of the story will prove inaccurate more often than those made after hearing from both sides. We have thus consistently recognized that the "fundamental instrument for judicial judgment" is "an adversary proceeding in which both parties may participate." *Carroll* v. *President and Comm'rs of Princess Anne*, 393 U. S. 175, 183 (1968). In the present context, some defendants (like the Kaleys) may be able to show that the theory of prosecution is legally defective through an argument that almost certainly was not presented to the grand jury. And as discussed above, *supra,* at 13–15, prosecutors in some cases elect not to freeze needed assets, or they negotiate tailored protective orders to serve the interests of both sides—something they would be unlikely to do if the hearings were rote exercises.

Given the risk of an erroneous restraint of assets needed to retain chosen counsel, the "probable value" of the "additional safeguard" a pretrial hearing would provide is significant. That is because the right to counsel of choice is inherently transient, and the deprivation of that right effectively permanent. In our cases suggesting that little would be gained by requiring an adversary hearing on probable cause or imposing stricter evidentiary requirements in grand jury proceedings, we have noted that the grand jury is not where the ultimate question of "the guilt

or innocence of the accused is adjudicated." *United States* v. *Calandra*, 414 U. S. 338, 343 (1974); see *United States* v. *Williams*, 504 U. S. 36, 51 (1992) (explaining that the grand jury hears only from the prosecutor because "'the finding of an indictment is only in the nature of an enquiry or accusation, which is afterwards to be tried and determined'" (quoting 4 W. Blackstone, Commentaries 300 (1769)). If the grand jury considers incomplete or incompetent evidence in deciding to return an indictment, the defendant still has the full trial on the merits, with all its "formalities and safeguards," *Gerstein* v. *Pugh*, 420 U. S. 103, 122 (1975), to prove his innocence.

Here, by contrast, the Government seeks to use the grand jury's probable cause determination to strip the Kaleys of their counsel of choice. The Kaleys can take no comfort that they will be able to vindicate that right in a future adversarial proceeding. Once trial begins with someone other than chosen counsel, the right is lost, and it cannot be restored based on what happens at trial. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U. S., at 333 (quoting *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965)). If the Kaleys are to have any opportunity to meaningfully challenge that deprivation, they must have it before the trial begins.

\* \* \*

The issues presented here implicate some of the most fundamental precepts underlying the American criminal justice system. A person accused by the United States of committing a crime is presumed innocent until proven guilty beyond a reasonable doubt. But he faces a foe of powerful might and vast resources, intent on seeing him behind bars. That individual has the right to choose the advocate he believes will most ably defend his liberty at trial.

The trial is governed by rules designed to ensure that, whatever the ultimate verdict, we can be confident to the extent possible that justice was done, within the bounds of the Constitution. That confidence is grounded in our belief in the adversary system. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring* v. *New York*, 422 U. S. 853, 862 (1975). Today's decision erodes that confidence by permitting the Government to deprive a criminal defendant of his right to counsel of choice, without so much as a chance to be heard on why such a significant pretrial deprivation is unwarranted.

The majority wraps up its analysis by blandly noting that Congress is of course free to extend broader protection to criminal defendants. *Ante*, at 20. Not very likely. In this area it is to the courts that those charged with crime must turn.

Federal prosecutors, when they rise in court, represent the people of the United States. But so do defense lawyers— one at a time. In my view, the Court's opinion pays insufficient respect to the importance of an independent bar as a check on prosecutorial abuse and government overreaching. Granting the Government the power to take away a defendant's chosen advocate strikes at the heart of that significant role. I would not do it, and so respectfully dissent.