Justice THOMAS, concurring.
I join the Court's opinion explaining why Ayala is not entitled to a writ of habeas corpus from this or any other federal court. I write separately only to point out, in response to the separate opinion of Justice KENNEDY, that the accommodations in which Ayala is housed are a far sight more spacious than those in which his victims, Ernesto Dominguez Mendez, Marcos Antonio Zamora, and Jose Luis Rositas, now rest. And, given that his victims were all 31 years of age or under, Ayala will soon have had as much or more time to enjoy those accommodations as his victims had time to enjoy this Earth.
Justice SOTOMAYOR, with whom Justice GINSBURG, Justice BREYER, and Justice KAGANjoin, dissenting.
At Hector Ayala's trial, the prosecution exercised its peremptory strikes to dismiss all seven of the potential black and Hispanic jurors. In his federal habeas petition, Ayala challenged the state trial court's failure to permit his attorneys to participate in hearings regarding the legitimacy of the prosecution's alleged race-neutral reasons for its strikes. See Batson *2211 v. Kentucky,476 U.S. 79, 97-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Court assumes that defense counsel's exclusion from these proceedings violated Ayala's constitutional rights, but concludes that the Ninth Circuit erred in granting habeas relief because there is insufficient reason to believe that counsel could have convinced the trial court to reject the prosecution's proffered reasons. I respectfully dissent. Given the strength of Ayala's prima facie case and the comparative juror analysis his attorneys could have developed if given the opportunity to do so, little doubt exists that counsel's exclusion from Ayala's Batsonhearings substantially influenced the outcome.
I
My disagreement with the Court does not stem from its discussion of the applicable standard of review, which simply restates the holding of Fry v. Pliler,551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). Fryrejected the argument that the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, compels federal courts to apply any standard other than that set forth in Brecht v. Abrahamson,507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), when assessing the harmlessness of a constitutional error on habeas review. 551 U.S., at 120, 127 S.Ct. 2321. Brecht,in turn, held that the harmlessness standard federal courts must apply in collateral proceedings is more difficult to meet than the " 'beyond a reasonable doubt' " standard applicable on direct review. 507 U.S., at 622-623, 113 S.Ct. 1710(quoting Chapman v. California,386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). More specifically, under Brecht,a federal court can grant habeas relief only when it concludes that a constitutional error had a " 'substantial and injurious effect or influence' " on either a jury verdict or a trial court decision. 507 U.S., at 623, 113 S.Ct. 1710.Later, O'Neal v. McAninch,513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), clarified that this standard is satisfied when a reviewing judge "is in grave doubt about whether" the error is harmless; that is, when "the matter is so evenly balanced that [a judge] feels himself in virtual equipoise as to the harmlessness of the error." Id., at 435, 115 S.Ct. 992(emphasis deleted). See also ante, at 2197 - 2198 (quoting O'Neal,513 U.S., at 436, 115 S.Ct. 992). Put differently, when a federal court is in equipoise as to whether an error was actually prejudicial, it must "treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." O'Neal,513 U.S., at 435, 115 S.Ct. 992.
In addition to confirming the Brechtstandard's continued vitality, Fryestablished its exclusivity. Fryexpressly held that federal habeas courts need not first assess whether a state court unreasonably applied Chapmanbefore deciding whether that error was prejudicial under Brecht.Such a requirement would "mak[e] no sense ... when the latter [standard] obviously subsumes the former." Fry,551 U.S., at 120, 127 S.Ct. 2321. Nothing in the Court's opinion today calls into question this aspect of Fry's holding. If a trial error is prejudicial under Brecht's standard, a state court's determination that the error was harmless beyond a reasonable doubt is necessarily unreasonable. See ante, at 2198 - 2199.
II
A
To apply Brechtto the facts of this case, it is essential to understand the contours of Ayala's underlying constitutional claim or-perhaps more importantly-to appreciate what his claim is not. Trial judges *2212 assess criminal defendants' challenges to prosecutors' use of peremptory strikes using the three-part procedure first announced in Batson. After a defendant makes a "prima facie showing that a peremptory challenge [was] ... exercised on the basis of race," the prosecution is given an opportunity to "offer a race-neutral basis for striking the juror in question," Miller-El v. Cockrell,537 U.S. 322, 328, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court then "decid[es] whether it was more likely than not that the challenge was improperly motivated." Johnson v. California,545 U.S. 162, 169, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). This determination is a factual one, which-as the Court correctly notes-reviewing courts must accord " 'great deference.' " See ante,at 2199 - 2200 (quoting Felkner v. Jackson,562 U.S. 594, 598, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011)(per curiam)).
Here, Ayala does not claim that the trial court wrongly rejected his Batsonchallenges based on the record before it. Rather, Ayala's claim centers on the exclusion of his attorneys from the Batsonhearings. Ayala contends that there is at least a grave doubt as to whether the trial or appellate court's consideration of his Batsonchallenges was substantially influenced by the trial court's erroneous refusal to permit his attorneys to appear at the hearings at which those challenges were adjudicated. Ayala's conviction must be vacated if there is grave doubt as to whether even just one of his Batsonchallenges would have been sustained had the defense been present. Snyder v. Louisiana,552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)(reversing a conviction after concluding that use of one peremptory strike was racially motivated).
B
The Court's Brechtapplication begins and ends with a discussion of particular arguments the Ninth Circuit posited Ayala's lawyers could have raised had they been present at his Batsonhearings. This approach fails to account for the basic background principle that must inform the application of Brechtto Ayala's procedural Batsonclaim: the "[c]ommon sense" insight "that secret decisions based on only one side of the story will prove inaccurate more often than those made after hearing from both sides." Kaley v. United States,571 U.S. ----, ----, 134 S.Ct. 1090, 1113, 188 L.Ed.2d 46 (2014)(ROBERTS, C.J., dissenting). Our entire criminal justice system was founded on the premise that "[t]ruth ... is best discovered by powerful statements on both sides of the question." United States v. Cronic,466 U.S. 648, 655, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)(internal quotation marks omitted). There is no reason to believe that Batsonhearings are the rare exception to this rule. Instead, defense counsel could have played at least two critical roles had they been present at Ayala's Batsonhearings.
First, Ayala's attorneys would have been able to call into question the credibility of the prosecution's asserted race-neutral justifications for the use of its peremptory strikes. Of course, a trial court may identify some pretextual reasons on its own, but Snyderheld that when assessing a claimed Batsonerror, "all of the circumstances that bear upon the issue of racial animosity must be consulted." Snyder,552 U.S., at 478, 128 S.Ct. 1203. Absent an adversarial presentation, a diligent judge may overlook relevant facts or legal arguments in even a straightforward case. There is also great probative force to a "comparative juror analysis"-an analysis of whether the prosecution's reasons for using its peremptory strikes against nonwhite jurors apply equally to white jurors whom it would have allowed to serve.
*2213 Miller-El v. Dretke,545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). See also Snyder,552 U.S., at 483, 128 S.Ct. 1203(emphasizing importance of conducting a comparative juror analysis in the trial court). Trial courts are ill suited to perform this intensive inquiry without defense counsel's assistance.
The risk that important arguments will not be considered rises close to a certainty in a capital case like Ayala's, where jury selection spanned more than three months, involved more than 200 prospective jurors, and generated a record that is massive by any standard. See Ayala v. Wong,756 F.3d 656, 660, 676 (C.A.9 2014)(case below). It strains credulity to suggest that a court confronted with this mountain of information necessarily considered all of the facts that would have informed its credibility determination without the presence of defense counsel to help bring them to its attention.
Second, not only did the exclusion of defense counsel from Ayala's Batsonhearings prevent him from making his strongest arguments before the person best situated to assess their merit, it also impeded his ability to raise these claims on appeal. Because Ayala's lawyers were not afforded any opportunity to respond to the prosecution's race-neutral reasons, we are left to speculate as to whether the trial court actually considered any of the points the defense would have made before it accepted the prosecution's proffered explanations. Moreover, even if we could divine which of the possible considerations the trial judge took into account, our review would still be unduly constrained by a record that lacks whatever material facts the defense would have preserved had it been on notice of the assertions that it needed to challenge. Perhaps some of these facts, such as the jurors' appearance and demeanor, were known to the trial judge, but appellate courts "can only serve [their] function when the record is clear as to the relevant facts" or when they can rely on "defense counsel['s] fail[ure] to point out any such facts after learning of the prosecutor's reasons." United States v. Thompson,827 F.2d 1254, 1261 (C.A.9 1987). Neither of these conditions is met here.
For the reasons described above, the fact that counsel was wrongfully excluded from Ayala's Batsonhearings on its own raises doubt as to whether the outcome of these proceedings-or the appellate courts' review of them-would have been the same had counsel been present.[1]This doubt is exacerbated by the loss of the vast majority of the questionnaires that jurors completed at the start of voir dire,including those filled out by the seven black and Hispanic jurors against whom the prosecution exercised its peremptory strikes. The prosecution cited these questionnaires in support of its alleged race-neutral reasons at the ex parteBatsonhearings. See e.g., App. 283, 298, 312, 314, 316. Without the underlying documents, however, it is impossible to assess whether the prosecution's characterizations of those prospective jurors' responses were fair and accurate. The loss of the questionnaires has also precluded every court that has reviewed this case from performing a comprehensive comparative juror analysis. The Court today analyzes how the prosecution's *2214 statements at the ex parteBatsonhearings regarding the black and Hispanic jurors' questionnaires stack up against the actual questionnaires completed by the white seated jurors and alternates. But there is no way to discern how these representations compare with the answers that were given by white jurors whom the prosecution would have permitted to serve but whom the defense ultimately struck. See Miller-El v. Dretke,545 U.S., at 244-245, 125 S.Ct. 2317(comparing a juror struck by the prosecution with a juror challenged only by the defense).
C
The above-described consequences of the trial court's procedural error and the fact that the prosecution struck every potential black or Hispanic juror go a long way toward establishing the degree of uncertainty that Brechtrequires. Keeping these considerations in mind, the next step is to assess the arguments that Ayala's attorneys may have raised had they been allowed to participate at his Batsonhearings. As explained above, Ayala is entitled to habeas relief if a reviewing judge is in "equipoise" as to whether his lawyers' exclusion from the Batsonhearings had an "injurious effect" on the trial court's failure to find by a preponderance of the evidence that any of the prosecution's peremptory strikes was racially motivated. With the inquiry so framed, it is easy to see that the Ninth Circuit correctly found that Ayala was actually prejudiced by the trial court's constitutional error. In particular, there is a substantial likelihood that if defense counsel had been present, Ayala could at least have convinced the trial court that the race-neutral reasons the prosecution put forward for dismissing a black juror, Olanders D., were pretextual.[2]
The prosecution offered three justifications for striking Olanders D.: (1) he might be unable to vote for the death penalty because he had written in his questionnaire that "he does not believe [in] it" and had failed to fully explain a subsequent change in position; (2) his questionnaire answers were poor; and, (3) he might lack the "ability to fit in with a cohesive group of 12 people." App. 283. The trial court rejected the third of these reasons outright, noting that "it may well ... be that he would get along very well with 12 people." Id.,at 283-284. I have grave misgivings as to whether the trial judge would have found it more likely than not that the first two purported bases were legitimate had defense counsel been given an opportunity to respond to them.
Ayala's attorneys could have challenged the prosecution's claim that Olanders D. would hesitate to impose the death penalty by pointing to a seated juror-Ana L.-who made remarkably similar statements concerning capital punishment. Based on his remarks during voir dire,it appears that Olanders D. suggested on his questionnaire that he was or had been opposed to the death penalty.[3]Id.,at 176, 179.
*2215 Ana L.'s questionnaire contained numerous comparable statements. When asked to express her "feelings about the death penalty," she wrote: "I don't believe in taking a life." Id.,at 108. And, in response to a question regarding whether she "would like to serve as a juror and why?", Ana L. said: "no-If I am selected as a Juror and all Jurors voted for the death penalty I probably would not be able to vote for the death penalty." Id.,at 109. Finally, on her questionnaire, Ana L. indicated that she believes the death penalty is imposed "[t]oo often" and that she strongly disagrees with the "adage, 'An eye for any eye,' " which she understood to mean, "[a] criminal took a life[,] now [it] is our turn to take his." Id.,at 108-109.
A direct comparison of Olanders D.'s and Ana L.'s voir direanswers is equally telling. During voir dire,Olanders D. clarified that he had not intended his questionnaire to reflect that he was categorically opposed to the death penalty, but only that his views on the topic had evolved over the prior decade and that he had come to believe that the death penalty "would be an appropriate sentence under certain circumstances." Id.,at 176. To account for this change in his position, Olanders D. cited a number of considerations, including a new understanding of what his religion required, ibid., "more familiar[ity] with the laws," id.,at 178, increased violence in our society, ibid., and conversations with his immediate family, id.,at 180. Ana L., by contrast, stated at voir direthat she "strongly ... did not believe in the death penalty" up until she "[f]illed out the questionnaire." Id.,at 193. And, only after repeated attempts by both the defense and the prosecution to get her to pinpoint what caused this sudden about face, Ana L. said that she had "listen[ed] to the Bundy evidence that was said and his being put to death, and I started to think; and I said if they were guilty maybe there is a death sentence for these people."Id.,at 202.[4]
Based on this record, it requires little speculation to see that defense counsel could have made a powerful argument that Ana L. was equally or even less likely to impose the death penalty than Olanders D. While both jurors had opposed the death penalty at some point in the past, Olanders D. stated that he had come to believe in capital punishment after a period of sustained deliberation. Ana L., however, purported to change her view due only to one recent execution and the fact that she had been called to serve as a juror on a capital case. Moreover, there is no basis to think that the trial court accounted for the similarities between Ana L. and Olanders D. Approximately two months passed between Olanders D.'s and Ana L.'s voir direhearings and the date on which the prosecution exercised its peremptory strike against Olanders D. Without the benefit of defense counsel to help jog his recollection, *2216 it is absurd to proceed as if the trial judge actually considered one of more than 200 prospective jurors' statements concerning the death penalty when ruling on Ayala's Batsonmotion. Taken together, it seems highly likely that these arguments-had they been raised-would have convinced the trial judge that the prosecution's first alleged reason for striking Olanders D. was pretextual.
As for the prosecution's second purported justification-that his questionnaire responses "were poor," id.,at 283-it is impossible to know what winning arguments the defense could have raised because the questionnaire itself is missing from the record.[5]Indeed, for all that is known, counsel may have had a compelling argument that Olanders D.'s answers were cogent and complete. Even if some of them were lacking, however, counsel could still have drawn the trial judge's attention to weak questionnaires completed by several of the seated jurors. For instance, if the prosecution's claim was that Olanders D.'s questionnaire answers were conclusory, Ayala's counsel could have referred the Court to seated juror Charles G.'s questionnaire. In response to a prompt asking prospective jurors to explain why they would or would not like to be empaneled in Ayala's case, Charles G. wrote only "No." Id.,at 71. Alternatively, if the prosecution's concern was that Olanders D.'s answer to a particular question demonstrated an inability to clearly express himself, the defense could have directed the court's attention to the questionnaire completed by seated juror Thomas B. When asked to share his "impressions or feelings ... about gangs based on what [he had] read or s [een]," Thomas B. stated: "I feel the only media coverage they get is bad, however, those whom do constructive events usually seek out positive media coverage." Id.,at 30. Finally, it bears noting that if Ayala's lawyers had been able to respond at the Batsonhearing, they would have had the questionnaires of many more comparable jurors at their disposal. It is entirely possible that some of the questionnaires completed by prospective jurors who were accepted by the prosecution but dismissed by the defense were weaker than those completed by Charles G. and Thomas B.
In short, it is probable that had Ayala's lawyers been present at the Batsonhearing on Olanders D., his strong Batsonclaim would have turned out to be a winning one. The trial judge rejected one of the reasons advanced by the prosecution on its own and the defense had numerous persuasive arguments that it could have leveled against the remaining two justifications had it been given the opportunity to do so.
III
The Court concludes that Ayala is not entitled to habeas relief because it finds that there is little or no reason to doubt that the trial judge would have accepted both of the above-discussed reasons for striking Olanders D. even if counsel participated at Ayala's Batsonhearings. The Court's analysis, however, misunderstands the record and mistakes Ayala's procedural Batsonclaim for a direct challenge to a trial court's denial of a Batsonmotion.
*2217 In defense of the prosecution's first basis for striking Olanders D.-that he was uncomfortable with the death penalty-the Court begins by asserting that Ana L. was insufficiently similar to Olanders D. to have cast any doubt on the prosecution's position. Olanders D., the Court maintains, "initially voiced unequivocal opposition to the death penalty," whereas Ana L. "wrote on [her] questionnaire that she 'probablywould not be able to vote for the death penalty.' " Ante, at 2200 - 2201 (emphasis in original). But the Court has plucked one arguably ambiguous statement from Ana L.'s questionnaire while ignoring others (described above) suggesting that she fundamentally opposed capital punishment. More importantly, the Court is not comparing apples with apples. Because Olanders D.'s questionnaire has been lost, there is no way to know the extent to which the views he expressed there were "unequivocal." Consequently, in support of its contention that Olanders D. originally wrote that he was categorically opposed to the death penalty, the Court relies on his response to a question posed by the prosecution during voir dire. To be sure, when asked whether he had stated that he did not "believe in the death penalty" on his questionnaire, Olanders D. responded: "That's correct." App. 179. During voir dire,however, Ana L. described the position she had taken in her questionnaire in identical terms, stating: "I remember saying [on my questionnaire] that I didn't believe in the death penalty." Id.,at 201.
Given the difficulty of differentiating between Ana L.'s and Olanders D.'s views toward the death penalty based on the record before us, the Court understandably does not press this factual point further. Instead, it commits a legal error by contending that the trial court's determination is entitled to deference because the judge-unlike this Court-had the benefit of observing both Olanders D.'s and the prosecution's demeanor. Ante, at 2201. Deference may be warranted when reviewing a substantive Batsonclaim. By suggesting that a trial judge can make a sound credibility determination without the benefit of an adversarial proceeding, however, the Court ignores the procedural nature of the constitutional error whose existence it purports to assume. Courts defer to credibility findings not only because of trial judges' proximity to courtroom events, but also because of the expectations regarding the procedures used in the proceedings that they oversee. A decision to credit a prosecution's race-neutral basis for striking a juror is entitled to great weight if that reason has "survive[d] the crucible of meaningful adversarial testing." Cronic,466 U.S., at 656, 104 S.Ct. 2039. It warrants substantially less-if any-deference where, as here, it is made in the absence of the "fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate." Carroll v. President and Comm'rs of Princess Anne,393 U.S. 175, 183, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); see also Kaley, 571 U.S., at ----, 134 S.Ct., at 1113(ROBERTS, C.J., dissenting) ("It takes little imagination to see that ... ex parteproceedings create a heightened risk of error").[6]
The Court's analysis of the second reason put forward for striking Olanders D.-that his questionnaire was faulty-fares no *2218 better. As a preliminary matter, perhaps because Olanders D.'s questionnaire has been lost, the Court characterizes the prosecution's second proffered reason for dismissing Olanders D. as an objection to allof his "responses" as opposed to simply the responses on his questionnaire. Ante,at 2200. But even if the prosecution had relied on the rationale that the Court now substitutes, there is a real likelihood that the defense would still have been able to undermine its credibility.
The Court asserts that Olanders D.'s "responses" were misleading because he had "unequivocally" stated that he did not believe in the death penalty on his questionnaire, but at voir direhe said that his views on capital punishment had changed over the previous 10 years. Ante, at 2202. The Court's argument thus hinges on the premise that Olanders D.'s questionnaire clearly stated that he was opposed to the death penalty. At least one person, however, did not construe Olanders D.'s questionnaire to express such a categorical view: defense counsel. During voir dire,one of Ayala's lawyers remarked that she thought Olanders D.'s questionnaire "indicated that [he] had had some change in [his] feelings about the death penalty." App. 176. "[M]y understanding," she said, "is that at one time [he] felt one way, and-and then at some point [he] felt differently." Ibid.Thus, if (as the Court now hypothesizes) the trial court was inclined to accept the prosecution's second reason for striking Olanders D. based on apparent tension between his questionnaire and his statements during voir dire(a proposition that is itself uncertain), the defense may have been able to argue persuasively that any claimed inconsistency was illusory.
* * *
Batsonrecognized that it is fundamentally unfair to permit racial considerations to drive the use of peremptory challenges against jurors. When the prosecution strikes every potential black and Hispanic juror, a reviewing court has a responsibility to ensure that the trial court's denial of the defendant's Batsonmotion was not influenced by constitutional error. But there is neither a factual nor a legal basis for the Court's confidence that the prosecution's race-neutral reasons for striking Olanders D. were unassailable. Because the Court overlooks that Ayala raised a procedural Batsonclaim, it scours the record for possible support for the trial court's credibility determination without accounting for the flaws in the process that led to it. The proper inquiry is not whether the trial court's determination can be sustained, but whether it may have been different had counsel been present. Given the strength of Ayala's prima facie case and the arguments his counsel would have been able to make based even on the limited existing record, grave doubts exist as to whether counsel's exclusion from Ayala's Batsonhearings was harmless. Accordingly, I respectfully dissent.

Indeed, in a future case arising in a direct review posture, the Court may have occasion to consider whether the error that the Court assumes here gives rise to "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic,466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). See also Mickens v. Taylor,535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)(noting that we have "presumed [prejudicial] effec[t] where assistance of counsel has been denied entirely or during a critical stage of the proceeding").

Because Ayala was actually prejudiced by his counsel's exclusion from the Batsonhearing on Olanders D., there is no need to address his claims concerning the other black and Hispanic jurors. That said, Ayala's attorneys may have had strong arguments with respect to those jurors too. Moreover, Ayala's Batsonchallenge to Olanders D. would have been even stronger had counsel been given the opportunity to demonstrate that some of the reasons given for striking the other black and Hispanic jurors were pretextual. See Snyder v. Louisiana,552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)(observing that courts should "consider the strike of [one juror] for the bearing it might have upon the strike of [a second juror]").

It is, of course, impossible to verify what Olanders D. said in his questionnaire because that document is not in the record. If Ayala's lawyers had been present at Olanders D.'s Batsonhearing, they may have argued that his questionnaire showed that his position on capital punishment had changed over time. See Part III, infra.

The Court claims that Olanders D. was less than eloquent in describing his thought process. Ante,at 2200 - 2201. But it is not difficult to understand what he meant. In any event, as the Court later concedes, prospective jurors are likely to struggle when asked to express their views on the death penalty. Ante,at 2201. Ana L. was no exception. For instance, when defense counsel first asked her to describe her thought process, she responded, "Up to [when I filled out my questionnaire], I did not believe in putting someone to death." App. at 194. She continued: "But being that you've given me the-the opportunity to come over here, seeing something that is not correct in the system, it wouldn't be no problem ... for me to give to come to a decision on the death penalty anymore." Ibid.

The Court states that the prosecution's second purported race-neutral reason for striking Olanders D. was that his "responses" were poor, but it conveniently neglects to mention that the responses to which the prosecution referred were clearly those Olanders D. gave on his questionnaire. Ante,at 2200; see App. 283 ("My observations in reading his questionnaire and before even making note of his racial orientation was that his responses were poor").

None of the cases the Court cites are inconsistent with this logic. Miller-El v. Dretke,545 U.S. 231, 236-237, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), Snyder,552 U.S., at 474, 128 S.Ct. 1203and Rice v. Collins,546 U.S. 333, 336, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), all concerned direct challenges to a trial court's denial of a Batsonmotion as opposed to procedural Batsonclaims.