2020 IL App (1st) 172825-U

THIRD DIVISION
June 30, 2020
Modified Upon Denial of Rehearing September 30, 2020

No. 1-17-2825

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 14 CR 3455 |
| AMBROCIO FLORES, | ) ) ) | Honorable Joseph M. Clapps, Judge Presiding |
| Defendant-Appellant. | ) ) | |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirmed. Circuit court did not err by denying defendant's motion to suppress evidence obtained pursuant to court-approved application to use eavesdropping device. Circuit court did not consider a factor inherent in offense of solicitation of murder for hire in sentencing defendant to 29 years' imprisonment.

¶ 2   After a bench trial, defendant Ambrocio Flores was convicted of two counts of solicitation of murder and two counts of solicitation of murder for hire and sentenced to 29 years' imprisonment. In this direct appeal, defendant maintains that (1) the circuit court erred by denying a motion to suppress recordings and transcripts  of phone conversations that the State

obtained pursuant to section 108A-4 of the Code of Criminal Procedure of 1963 and (2) the court erred at sentencing by considering factors inherent in defendant's offense. We affirm.

¶ 3                                    BACKGROUND

¶ 4     The events that led up to defendant's indictment and ultimate conviction began on January 7, 2014. On that day, Robert Pyett informed Larry Mason, the Chief of Police for the Wonder Lake Police Department, that he had information indicating that defendant was orchestrating a murder-for-hire scheme. Chief Mason relayed that information to Illinois State Police Master Sergeant Gainer, who in turn assigned Illinois State Police Special Agent Jose Nevarez to investigate.

¶ 5     On January 20, 2014, Special Agent Nevarez interviewed Pyett, the informant. Special Agent Nevarez described the results of that interview, and the fruits of his later investigation, in an affidavit in support of an application to use an eavesdropping device under section 108A-4 of the Code of Criminal Procedure. See 725 ILCS 5/108A-4 (West 2014). The application was presented on January 28, 2014. The sufficiency of Special Agent Nevarez's affidavit forms the crux of defendant's principal claim on appeal, so while it is lengthy, it is best to quote its substance (preliminaries aside) in full:

    "I am investigating an individual named Ambrocio Flores (M/H, DOB: 12/07/69, 4019 N. Lavergne, Chicago, Illinois). I have personal knowledge of the facts set forth in this affidavit based on my participation in the investigation described below through discussions with other Federal, State and local law enforcement personnel involved.

    On January 17, 2014, I was assigned by Master Sergeant Gainer to investigate a Solicitation of Murder after he received a phone call from Chief Larry Mason of the Wonder Lake Police Department. Chief Mason informed Master Sergeant Gainer a

2

former confidential source had contacted him regarding a Solicitation for Murder. On January 20, 2014, I interviewed Confidential Source Robert Pyett and he related in summary but not verbatim the following:

On January 16, 2014, Pyett informed investigators that he had information Ambrocio Flores was soliciting murder for hire. During the conversation Pyett said Flores was looking for help with killing a male and female. Pyett stated Flores did not provide the identities of the male and female he wanted killed, but did say the intended victims lived in the Chicago area. On January 7, 2014, Flores told Pyett he only wanted to take care of the female because he only had $4,000 to $5,000 dollars. Flores told Pyett he would want the male taken care of at a later time.

During the interview with Pyett, it was decided to have an undercover investigator's telephone number passed on to Flores. The Alcohol Tobacco and Firearms Special Agent, Gustavo Buenovites a/k/a/ Gus, was purported to be an acquaintance of Pyett and a "hit man." I informed Pyett he would be contacted at a later date and provided the undercover telephone number so he could give it to Flores.

On January 24, 2014, at approximately 10:00 a.m., I contacted Pyett via telephone and provided the undercover telephone number of Gustavo Buenovites a/k/a Gus. I instructed Pyett to give the number to Flores and have him call Special Agent Gustavo Buenovites a/k/a Gus.

On January 24, 2014, at approximately 5:00 p.m., Special Agent Gustavo Buenovites a/k/a Gus received a telephone call from Ambrocio Flores. During that conversation, Flores told Gus he has two problems that he needs to take care of. Flores told Gus he only had enough money to take care of one problem at this time. Flores

informed Gus he did not want to talk on the phone, but wanted to meet in person. Gus informed Flores if he was unable to get to Chicago due to weather that his brother in law, Alcohol Tobacco and Firearm Special Agent Chris Bayless a/k/a Chris, lived in the Chicago area and would come meet with him. Flores told Gus that was fine.

It is our plan to have the Consenting Parties, Special Agent Gustavo Buenovites a.k.a. Gus and/or Special Agent Chris Bayless a/k/a Chris, meet with Ambrocio Flores on January 29, 2014. I believe conversations will take place between the Consenting Parties, Gustavo Buenovites, Chris Bayless and Ambrocio Flores regarding the offense of Solicitation of Murder and Solicitation of Murder for Hire."

¶ 6	On January 24, 2014, Special Agent Nevarez appeared before Judge Ford in the criminal division of the circuit court of Cook County and presented an application for use of an eavesdropping device, often described as an "overhear order." The application was supported by, among other things, the affidavit quoted above. Judge Ford granted the overhear order the same day.

¶ 7	Thereafter, the police staged additional conversations and meetings with defendant. During these meetings, defendant gave an undercover officer $500 and two photographs of a woman. Defendant was arrested and, in March 2014, was charged by indictment with three counts of solicitation of murder and three counts of solicitation of murder for hire.

¶ 8	Defendant moved to quash the overhear order. A hearing was held in March 2016. While much of what transpired at the hearing is irrelevant for purposes of this appeal, the following facts bear mentioning, because they are some of the bases of defendant's criticism of the affidavit used to secure the order. First, defendant points to discrepancies between Nevarez's sworn affidavit and his sworn testimony at the suppression hearing, taken on direct examination

by defense counsel. And second, defendant points to testimony elicited from Nevarez revealing that at some point (it is not clear *when*), Pyett was paid $2500 for providing the information about defendant to the police.

¶ 9    We begin with the purported discrepancies between the statements in Nevarez's affidavit and his testimony at the suppression hearing. There are three.

¶ 10    First, in discussing the January 24, 2014 phone call between Special Agent Benavides (undercover as "Gus") and defendant, Nevarez testified that the call was originated by the informant, Pyett, who then handed the phone to defendant. Yet in his affidavit, Nevarez indicated that this phone call was originated by defendant—to be specific, as quoted above, the affidavit said that Benavides "received a telephone call from Ambrocio Flores."

¶ 11    Second, regarding that same phone call, Nevarez testified at the hearing that the man on the other end of the phone identified himself as "Juan," not "Flores" or "Ambrocio" or any derivation of defendant's actual name. In his affidavit, Nevarez made no mention of the name "Juan" and indicated that the individual on the other end of the phone conversation was defendant. But on cross-examination by the State, Nevarez testified that on June 3, 2015, about 18 months after the affidavit was presented, Nevarez interviewed the informant, Pyett, who told him that defendant had told Pyett to introduce him on the phone as "Juan."

¶ 12    Third, Nevarez testified at the hearing that this January 24 phone call was recorded, but there was no mention of that fact in the affidavit.

¶ 13    Next, the evidence that Pyett was paid for his testimony. First, recall Nevarez's affidavit which we restated nearly verbatim above. The affidavit said many things, but it did not tell Judge Ford that at some point, Pyett was paid $2500 for the information he provided about defendant.

During the suppression hearing, however, Nevarez testified that "pursuant to an agreement," Pyett was paid $2500 for providing information about defendant.

¶ 14    The court ultimately denied defendant's motion to quash the overhear order. The court stated on the record:

> "[I]t is clear, as I said during the course of the motion, more accurate information could have and should have been given to the Magistrate, but it doesn't change the reasonableness of the request based on what the informant, whose name was identified, told the police and the verification of the existence of someone who wanted at least two people dead. It is reasonable."

¶ 15    The case then proceeded to a bench trial. Defendant does not challenge the sufficiency of the evidence nor allege any trial errors, so our discussion of the trial testimony will be brief.

¶ 16    At trial, Alejandra Ocampo testified that from 2012 to 2013, she worked at Wishbone Restaurant. Defendant was one of her co-workers. Ocampo testified she and defendant were "[f]riends and coworkers," that she and defendant exchanged phone numbers, and that defendant sometimes drove Ocampo home from work. According to Ocampo, at some point, defendant intimated to her that he wanted to be more than friends. In response, Ocampo told defendant he needed to "resolve his situation with his wife first." Sometime thereafter, defendant stopped working at Wishbone.

¶ 17    The testimony of the investigation and arrest of defendant came from the three law enforcement officers involved. First, Special Agent Nevarez of the Illinois State Police, the drafter of the affidavit. Second, Special Agent Benavides of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), located in the Dallas office, who typically worked undercover

assignments and who spoke Spanish (defendant's native language). As noted above, Benavides worked this case posing as a hitman named "Gus."

¶ 18    And third, another ATF agent named Chris Bayless, who typically worked undercover but worked in the Chicago office. Bayless became involved in the investigation because it was difficult for Benavides ("Gus") to travel to Chicago for the face-to-face meeting with defendant. So a cover story was created that "Gus" had a brother-in-law who would meet personally with defendant, and Bayless played that role. Bayless described his and Benavides's undercover roles as "some type of enforcers or collectors of drug debts and also hitmen."

¶ 19    Picking up where the Nevarez affidavit left off:  The day after the overhear order was entered, on January 29, 2014, defendant and the cooperating informant, Pyett, called Benavides ("Gus"). Because "Gus" could not be physically present, defendant agreed to meet with Bayless, posing as the brother-in-law of "Gus." Because Bayless did not speak Spanish and Benavides and defendant did, the plan was that Bayless would meet with defendant, but they would call Benavides on a speakerphone so he could translate.

¶ 20    The next day, January 30, Special Agent Bayless drove to the vicinity of 4019 North Lavergne Avenue in Chicago. Bayless left his vehicle and walked to a building, where he briefly "exchanged pleasantries" with Pyett and defendant. Bayless then told defendant that they should walk to his pick-up truck to talk. (Bayless's undercover ATF vehicle was wired for audio and video recording; Bayless also wore a second audio and video recording device on his person.)

¶ 21    Once he was inside Bayless's vehicle, defendant said he wanted a woman named Alejandra Ocampo, with whom he was having problems, killed. According to Bayless, in addition to naming Ocampo as the target, he and defendant discussed where the killing would take place and "negotiated back and forth on the price."

¶ 22    Ultimately, Special Agent Bayless "agreed" to kill Ocampo, while she was leaving her home on her way to work, for $2,500. Defendant instructed that he wanted the killing to look like a robbery, so he asked that Bayless take Ocampo's cell phone and purse. At defendant's instruction, Bayless then drove to a different address in Chicago where Ocampo's apartment building was located. Bayless then drove back to 4019 North Lavergne Avenue. Once back, defendant went into a building. A few minutes later, he came back and gave Bayless a $500 down payment, photos of Ocampo, and her phone number and address. Bayless testified that these conversations were recorded pursuant to the court's overhear order.

¶ 23    On February 3, 2014, Special Agent Bayless again met defendant in person at 4019 North Lavergne Avenue. They again put "Gus" on the speakerphone. During that three-way conversation, defendant reiterated his request for Ocampo's phone and purse and agreed to pay the remaining $2,000 after the killing was completed. During that conversation, Bayless told "Gus" to ask defendant in Spanish ("to make sure he understood" the question, according to Bayless at trial) if Pyett was playing a role in the murder—that is, whether Pyett "was participating in, or had anything to do with, or was pushing [defendant] to do this murder." Defendant answered that he was not.

¶ 24    Defendant and Bayless then drove back to Ocampo's apartment building. There, defendant showed Special Agent Bayless the route Ocampo took to walk to the bus and pointed out an alley that he believed would be a suitable point to ambush Ocampo.

¶ 25    All the conversations on that day were likewise recorded pursuant to the court's overhear order.

¶ 26    On cross-examination, Bayless agreed that defendant never used the words "kill" or "murder" during the January 30, 2014 conversation. He explained, however, that "the context of

our conversation was that he needed somebody killed." However, on redirect examination, Special Agent Bayless testified that defendant said, quote, "I need her dead, dead."

¶ 27    The State then rested. Defendant did not put on any witnesses or evidence. After closing argument, the court found defendant guilty of two counts of solicitation of murder-for-hire and two counts of solicitation of murder.

¶ 28    During the sentencing hearing, the court considered the seriousness of defendant's conduct—specifically, that defendant evidently wanted Ocampo killed because she rejected his romantic advances—as an aggravating factor. The court explained:

"Although you are correct, threatening violence is part of the elements of the offense, solicitation of murder for hire, the fact he did that is not in itself aggravating. However, what is aggravating is the manner in which you commit the offense.

As it applies to all offenses, there is different degrees of conduct. He has shown absolutely no remorse. There could be situations where there would be some mitigation. Not to say there is ever a reason. Certainly to ask someone for or to solicit someone to kill another person, there would be factual circumstances where a reason would be mitigating. That's not true here. It is absurd. I mean at the very best, this woman didn't want to date him, that's it. I mean to do what he did shows a callous disregard for others.

You know, the State is correct, a sentence in this case can't deprecate the seriousness of what he's done. A sentence that I impose has to be considered to deter other people who think about getting rid of people they don't like by hiring somebody to kill them. In a free society that can't happen."

The court ultimately sentenced defendant to 29 years imprisonment, nine years above the minimum and eleven years below the 20-to-40-year sentencing range. This appeal followed.

¶ 29                                                    ANALYSIS

¶ 30     We first consider defendant's argument that the circuit court erred by denying his motion to suppress evidence obtained as a result of the court's overhear order. Defendant maintains that Judge Ford should have denied Special Agent Nevarez's application, because Nevarez's affidavit did not support a finding of reasonable cause, as required by section 5/108A-4 of the Code.

¶ 31     Section 5/108A-4 provides:

"The judge may authorize or approve the use of the eavesdropping device where it is

found that:

(a) one party to the conversation has or will have consented to the use of the

device;

(b) there is reasonable cause for believing that an individual is committing, has

committed, or is about to commit a felony under Illinois law;

(c) there is reasonable cause for believing that particular conversations concerning

that felony offense will be obtained through such use; and

(d) for any extension authorized, that further use of a device is warranted on

similar grounds." 725 ILCS 5/108A-4 (West 2014).

This case implicates the second requirement, that there be "reasonable cause" to believe that the person to be surveilled is, has, or is about to commit a felony.

¶ 32     We have explained that "reasonable cause" is synonymous with probable cause. *People v. Calgaro*, 348 Ill. App. 3d 297, 301 (2004). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). And for that reason, the Supreme Court has explained, probable cause is a " 'a fluid concept' that is 'not

readily, or even usefully, reduced to a neat set of legal rules.' " *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates,* 462 U.S. 213, 232 (1983)).

¶ 33     A finding of probable cause " 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *Id.* (quoting *Gates*, 462 U.S. at 243–244, n.13). That standard, the Supreme Court has repeatedly admonished, "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014); see *People v. Lee*, 2018 IL App (3d) 160100, ¶ 17 (internal quotations and citations omitted) ("Probable cause is not a high bar. It exists if, from the standpoint of an objectively reasonable officer, the items or events at issue create a reasonable probability that defendant committed or is committing a crime."). The government need only show the "kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.' " *Kaley*, 571 U.S. at 338 (quoting *Florida v. Harris,* 568 U.S. 237, 244 (2013)). Thus, the task of a judge faced with an application pursuant to section 5/108A-4 of the Code is to "simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238.

¶ 34     Here, Nevarez's affidavit revealed that a confidential informant (whose name was later revealed to the defense) came forward with information that defendant was planning a murder-for-hire scheme. That information was corroborated by the State before Special Agent Nevarez presented the application to Judge Ford. Specifically, the affidavit averred that on January 24, 2014, Special Agent Benavides spoke to defendant on the phone and was told by defendant that he had two problems that needed to be taken care of.

¶ 35    Under any standard of review, viewing the totality of the circumstances, given the context of the call, a law enforcement officer could have reasonably believed that, by referring to "problems that needed to be taken care of," defendant meant people he wanted *killed*. We thus reject defendant's argument that court erred by denying his motion to suppress. Special Agent Nevarez's affidavit contained sufficient information to support of a finding of probable—and by extension *reasonable*—cause.

¶ 36    In urging us to reach a contrary conclusion, defendant highlights many perceived evidentiary shortcomings in Nevarez's affidavit. Those flaws are not entirely without merit, but they do not change our conclusion.

¶ 37    First, as previously noted, defendant claims that the affidavit misrepresented who initiated the first call, on January 24, 2014, between Special Agent Benavides ("Gus"), defendant, and the informant, Pyett. The affidavit said that Benavides "received a telephone call from Ambrocio Flores," when in fact, during the suppression hearing, Special Agent Nevarez testified that Pyett initiated the phone call and then handed the phone to defendant.

¶ 38    Technically, defendant is correct, but it strikes us as no more than a technicality. The call was initiated from defendant's end of the phone, not Benavides'. Yes, Pyett was the one apparently dialing the number and first speaking with Benavides before handing over the phone to defendant, so the affidavit was not fully accurate. But we find nothing material in this error.

¶ 39    The second flaw, also previously mentioned, is that the affidavit said that defendant, Ambrocio Flores, was a party to that call on January 24, but Nevarez testified at the suppression hearing that this individual only identified himself on that call as "Juan." Defendant is correct that the affidavit should have included this information.

¶ 40      But the circumstances related in the affidavit demonstrate that Nevarez, in drafting the affidavit, had good reason to believe that the individual on that call was defendant. Before that telephone call was made, Nevarez had been given defendant's name as a suspect and had spoken with Pyett about defendant's involvement in this murder-for-hire scheme. The morning of that January 24 call, Nevarez again spoke with Pyett, gave him the phone number for Benavides, and "instructed Pyett to give the number to [defendant] and have him call" Benavides. That call happened later that day, in the evening of January 24. So while the affidavit should have been more carefully drafted to include the self-reference of "Juan," Nevarez had ample reason to believe that the person on the call was, in fact, defendant.

¶ 41      Third, Nevarez testified at the hearing that this January 24 phone call was recorded, but there was no mention of that fact in the affidavit. Again, we agree with the trial court that this information should have been included, but that information would have only *bolstered* the strength of the affidavit, not lessened it. It does not strike us as a significant omission.

¶ 42      Defendant also complains that the affidavit did not demonstrate a sufficient basis to rely on the confidential informant, Pyett. Defendant notes that Pyett was a *paid* informant, but that information regarding Pyett's status as a paid informant was omitted from Nevarez's affidavit and otherwise concealed from  Judge Ford.

¶ 43      While we do not condone the government's behavior in omitting the fact that Pyett was paid for his information in its submissions to Judge Ford, the fact of that omission is not alone dispositive. We know from Neverez's affidavit that a fellow law-enforcement officer had related Pyett's information about the murder-for-hire scheme and explained that Pyett had previously served as a confidential informant. But importantly, we also know from the affidavit that before

13

going to Judge Ford, the law enforcement officers assigned to this case undertook additional steps in their investigation which ultimately produced evidence corroborating Pyett's tip.

¶ 44    Specifically, after interviewing Pyett (and obviously finding him credible enough to warrant further investigation), Nevarez set up a phone call between Pyett and defendant, on one end, and Special Agent Benavides on the other, to discuss the murder-for-hire scheme. That phone conversation, according to the affidavit, indicated that defendant said that he had "two problems *** to take care of" but that he "only had enough money to take care of one problem at this time."

¶ 45    In our view, the affiant articulated sufficient reason, with sufficient corroboration—notwithstanding the discrepancies highlighted by defendant and Pyett's status as a *paid* informant—to believe that defendant was planning to hire someone for murder. The affidavit was enough for the judge to find reasonable cause to believe that defendant was going to commit the crime of murder-for-hire. We thus find no error in the granting of the overhear authorization and no error in the trial court denying the motion to quash.

¶ 46    Next, defendant argues that the court erred at sentencing by considering a factor in aggravation that was inherent in the element of the offense. Defendant says that the trial court considered as an aggravating factor that defendant's actions threatened violence toward Ms. Ocampo, which is an element of the crimes for which he was convicted. To put a finer point on it, defendant points to the trial court's statement that it was the "manner" in which defendant committed the crime that was an aggravating factor; and in defendant's view, the "manner" in which he committed the crime was hiring someone to kill Ocampo. Thus, he says, the court improperly considered an element of the crime (if not the crime itself) as an aggravating factor.

¶ 47 The trial court has broad discretion in weighing the aggravating and mitigating factors, and we will not reverse that sentence absent an abuse of discretion. *People v. Alexander,* 239 Ill.2d 205, 212 (2010). A sentencing court does, however, abuse its discretion if it considers in aggravation a factor that is an element of the offense, as doing so amounts to double punishment. See *People v. Phelps,* 211 Ill. 2d 1, 11–12 (2004). This is not a mechanical rule meant to apply so rigidly that a trial judge can't even mention an element; we construe the court's comments as a whole and in their proper context. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 13.

¶ 48 We disagree with defendant's take on the trial judge's comments. The court made clear that its focus in aggravation was not merely on the fact that defendant hired someone to kill Ocampo but the *reason*—that Ocampo had rejected his romantic overtures. The court indicated that there might be cases where a murder-for-hire, though illegal, might have a mitigating element, such as a father wanting to kill a man because the man had hurt his child. Here, on the other hand, the court felt that the pendulum swung the other way into aggravation; Ocampo had not harmed or done wrong to defendant or his family but had merely rejected the romantic advances of a married man. It was not error for the court to account for defendant's flippant attitude toward human life. We uphold the sentence.

¶ 49                                         CONCLUSION

¶ 50 The judgment of the circuit court is affirmed.

¶ 51 Affirmed.

15